### WATERS-PIERCE OIL COMPANY v. THE STATE OF TEXAS.

Decided March 9, 1898.

1. **Unlawful Combination—Foreign Corporation—Permit to Do Business—Forfeiture.**

   A course of dealing between a foreign corporation and dealers in oil, binding the latter to buy only of the former, to sell only at a fixed price, and not to sell to competing dealers, constituted such violation of the Acts of May 30, 1889, and April 30, 1895, prohibiting combinations in restraint of trade, as warranted the forfeiture of such corporation's permit to do business in the State, except as to interstate commerce.

2. **Same—Constitutional Law—Police Power.**

   The laws prohibiting combinations in restraint of trade (Acts March 30, 1889, and April 30, 1895) are a legitimate exercise of the police power of the State, and are not within the prohibition of the Constitution of the United States or that of the State of Texas, either as denying to certain citizens or classes the equal protection of the laws, or depriving them of property without due process of law.

3. **Pleading—Anti-Trust Law—Interstate Commerce.**

   See pleading held to charge a foreign corporation with engaging in domestic as well as interstate commerce, and hence to be subject to regulation by the State.

4. **Evidence Showing Domestic Commerce.**

   See evidence held to show transactions constituting domestic commerce and subject to State regulation.

5. **Foreign Corporation—Illegal Combination—Forfeiture of Permit as to Domestic Commerce.**

   Courts may pronounce judgment against a foreign corporation, engaged in both interstate and domestic business and found guilty of unlawful combinations in restraint of trade, forfeiting its permit to do business in the State as to domestic, but leaving unaffected its rights as to interstate commerce.

6. **Foreign Corporation—Forfeiting Permit—Impairing Contract.**

   The right granted a foreign corporation to do business in the State for a term of years was subject to forfeiture for violation of the statutes, and such forfeiture did not impair the obligation of the contract granting it such permit.

7. **Agency—Criminal Act.**

   A corporation may become bound by the acts of its agents within the scope of their duty, though the act involves a criminal responsibility on the part of the agent.

8. **Same—Knowledge of Principal.**

   See evidence held sufficient for holding a corporation responsible for unlawful contracts in restraint of trade made by its agents, on the ground that, with knowledge, it acquiesced in and accepted the benefits of their agreements.

Vol. XIX. Civil—1

**9. Contracts in Restraint of Trade—Evidence.**

On the issue of unlawful trade combinations by a corporation, evidence tending to show the methods of its agents in doing business in the State and knowledge thereof by the corporation, is admissible.

**10. Best Evidence.**

Testimony of a witness that no objections were made by defendant's agent to his acts as reported to such agent, was not objectionable as implying a statement of the contents of such reports.

**11. Agency—Evidence.**

An agent can not testify that he was not authorized by his principal to do certain acts, nor the principal that he did not authorize them.

**12. Evidence—Self Serving Declarations.**

Statements in a circular letter issued by defendant, to the effect that certain transactions by its agents were without its authority or knowledge, were not admissible in its behalf.

**13. Evidence—Civil Cases—Reasonable Doubt.**

An action to forfeit the permit to a corporation to do business is a civil controversy and the charge need not be proven beyond a reasonable doubt.

APPEAL from Travis.    Tried below before Hon. R. E. BROOKS.

The following were among the assignments of error urged by appellant:

"31.    The Court erred in admitting, over the objections of defendant, the testimony of W. C. Dugger, to the effect that this defendant's agent at Galveston, Arthur M Finlay, had never objected to any of the acts of said Dugger, done in obedience to the instructions of Waggoner and other agents, all as shown by exceptions duly reserved in the statement of facts."

"36.    The court erred in refusing to admit in evidence the testimony of William Grice, for this defendant, to the effect as to whether or not he, as division manager, had ever had any authority from any officer of the Waters-Pierce Oil Company to sell oils in Texas on condition that they would be resold at a fixed price, which testimony was excluded by the court and exception saved, as shown by statement of facts."

The court ruled as follows:    "I will permit defendant to show what his powers were as agents; that is, if it was in writing, to show what the writings were, to produce the writings, to show that the writings he received were all he received on the question of his powers as agent, you can show it in a negative way.    I will permit you to show what instructions that have been destroyed were, not what they were not."

"38.    The court erred in refusing to admit in behalf of defendant the testimony of H. C. Pierce, to the effect that if any contracts or agreements in violation of the laws of Texas were made by agents in Texas, they were not authorized either by himself or any other officer of the Waters-Pierce Oil Company, all as shown by exception duly saved in statement of facts.

"39.    The court erred in striking out from the circular of defendant, of date December 31, 1895, the following words as incompetent, upon objection by the State 'such arrangements, if made, were effected with-

out the authority or knowledge of the company, and contrary to its policy and previous instructions on the point,' all as shown by the statement of facts."

*John D. Johnson* and *Clark & Bolinger,* for appellant.

*M. M. Crane,* Attorney-General, and *T. A. Fuller,* Assistant, for appellee.

FISHER, CHIEF JUSTICE.—The object of this suit, the laws under which it is brought, and the issues involved, are so accurately stated in the admirable charge of the trial court, that we set it out in full, as giving all the information needed upon these questions.

"1.   This is a suit by the State of Texas, as plaintiff, against the Waters-Pierce Oil Company, a private corporation, and E. T. Hathaway, William Grice, F. A. Austin, J. W. Keenan, and Lewis Fries, as defendants, to cancel the permit of said Waters-Pierce Oil Company to do business in this State and to enjoin all of said defendants from further transacting the business of said company in this State, on account of an alleged violation of the laws of this State against trusts by said company, its agents, and employes.

"2.   The plaintiff alleges that the defendant, Waters-Pierce Oil Company, is a private corporation, incorporated under the laws of the State of Missouri, for the purpose of dealing in petroleum and its products and in selling the same in the State of Missouri and other States, and that on July 6, 1889, said company filed its articles of incorporation in the Secretary of State's office in this State, and secured a permit to transact its said business in the State of Texas for a term of ten years, as provided by the laws of this State, and that since said date defendant company has been transacting its said business in this State and has divided this State into five general divisions for the purpose of transacting its said business, and that the defendants, E. T. Hathaway, F. A. Austin, William Grice, J. W. Keenan, and Lewis Fries are the respective managers of defendant company in said general divisions of this State, and have appointed various local agents throughout this State for the transaction of its business.

"3.   Plaintiff further alleges that the defendant company has violated the law of this State against trusts by making and entering into a contract with and becoming a member of the Standard Oil Trust, which contract and agreement is set out in full in plaintiff's petition, and for doing certain other acts in connection with said Standard Oil Trust agreement.

"3½.   Plaintiff also alleges that the defendant company has violated the law of this State against trusts by entering into a contract with the Eagle Refining Company, with C. W. Robinson, with J. L. Lewis, and Stillwell Bros., as set out in plaintiff's petition and introduced in evidence before you

"4. Plaintiff further alleges that, since July 6, 1889, said defendant company has been and still is engaged in dealing in and selling the products of petroleum in this State, and that during that time said company has made and is still making, through its agents in this State, contracts and agreements by and between said company and other parties dealing in, buying, and selling similar oils in his State, by the terms of which agreements said parties, for a valuable consideration paid them by defendant company, agreed and contracted that they would not buy any oils from any other person or corporation, but would deal with and buy and sell oils obtained from said defendant company exclusively; that said company has further contracted with certain of said persons as aforesaid, for a valuable consideration paid by defendant company to said parties, by the terms of which said parties contracted and agreed to buy from and sell the oils of defendant company exclusively, and not to sell the oils so bought, as aforesaid, to anyone buying from or dealing with any other person or corporation dealing in such oils in competition with said defendant company. And further, that said company, since July 6, 1889, has made and entered into other contracts and agreements by and between it and various others dealing in, buying, and selling oils, by the terms of which said parties agree with said company to purchase its said oils and to sell the same to others desiring to purchase the same, at prices fixed and established by it or its agents and officers; the names and dates and contracts above referred to are set out in plaintiff's petition.

"5. Plaintiff further alleges that prior to July 6, 1889, and also since that date, the defendant company entered into certain contracts in writing with certain parties in Brownsville, Texas, by the terms of which said parties bound themselves to buy all their oil from defendant company for a fixed period, in consideration of certain rebates allowed them by defendant company, and also agreed to sell such oil at a price fixed by defendant company, and that such contracts as were entered into prior to 1889 have been carried out and executed and business done thereunder by said parties since that date to the present time; the parties with whom said contracts were made and the terms thereof are set out in plaintiff's petition.

"6. Plaintiff alleges that all of said contracts above mentioned were made by the agents of said defendant company, and were authorized by it and were fully ratified and carried out by it after same had been so made, and that the same were a violation of the laws against trusts of this State; that the products of petroleum are articles of prime necessity to the people of this State, and that, by reason of said acts and contracts, said defendant company has forfeited its right to transact business in this State; and prays for an injunction prohibiting the defendant company, its agents and employes from further violating said statute, and for a decree canceling the permit of said company to do business in this State.

"7.   The defendants answer by a general denial of all the allegations of plaintiff's petition, and especially answer that the Waters-Pierce Oil Company is the real defendant in this action, and that the other parties named as defendants are simply its agents in the State of Texas.

"It further says that the State of Texas is estopped from canceling defendant's permit to do business in this State, because that on July 6, 1889, through its proper officers, and in pursuance of the provisions of the law of this State, it did for a sufficient and lawful consideration issue to said company a permit to do business in this State for a term of ten years from that date, and that said permit was a valid and binding contract between it and the State of Texas.

"8.   Defendant further pleads that it is a foreign corporation, of the State of Missouri, having its principal office in said State of Missouri, and that the business transacted by it in the State of Texas was interstate commerce and not subject to the laws of the State of Texas.

"Defendant denies that it ever became a member of or a party to the Standard Oil Trust agreement, or that it acted with said trust or was controlled by said trust in any way; that said trust was dissolved March 21, 1892.

"Defendant denies that it ever entered into any of the contracts or agreements with the parties named in plaintiff's petition, for the sale of its oil, and that if any such contracts or agreements were entered into, as set forth in plaintiff's petition, with anyone representing the defendant company, either as agent, attorney, employe, servant, or otherwise, the same was never known to the defendant company, nor did it ever sanction or ratify such contract, either directly or indirectly; wherefore, they pray that plaintiff take nothing by this suit.

"9.   Upon the law of the case, you are instructed as follows: Under the laws of this State, a trust is defined as follows:

"A trust is a combination of capital, skill or acts, by two or more persons, firms, corporations, or associations of persons, or either two or more of them, for either, any, or all of the following purposes:

"(1)   To create or carry out restrictions in trade, or commerce, or aids to commerce, or to create or carry out restrictions in the full and free pursuit of any business authorized or permitted by the laws of this State.

"(2)   To increase or reduce the price of merchandise, produce, or commodities.

"(3)   To prevent competition in manufacture, making, transportation, sale, or purchase of merchandise, produce, or commodities, or to prevent competition in aids to commerce.

"(4)   To fix at any standard or figure, whereby its price to the public shall be in any manner controlled or established, any article or commodity or merchandise, produce, or commerce, intended for sale, use or consumption in this State.

"(5)   To make or enter into or execute or carry out any contract, obligation, or agreement of any kind or description, by which they shall bind or have bound themselves not to sell, dispose of, or transport any

article or commodity or article of trade, use, merchandise, commerce, or consumption, below a common standard figure, or by which they shall agree in any manner to keep the price of such article, commodity, or transportation at a fixed or graded figure, or by which they shall in any manner establish or settle the price of any article, or commodity, or transportation, between them or themselves and others, to preclude a free and unrestricted competition among themselves or others in the sale or transportation of any such article or commodity, or by which they shall agree to pool, combine or unite any interest they may have in connection with the sale or transportation of any such article or commodity, that its price might in any manner be affected.

"10. Now, if you find from the evidence that the defendant company, acting through its duly appointed and authorized agents, entered into and performed a contract in the State of Texas with any of the parties dealing in, buying, and selling oils, as named and set out in plaintiff's petition, since July 6, 1889, by the terms of which contract it was agreed that said parties were to buy oil from the defendant company exclusively, for any specified time, and from no other source, in consideration of rebates allowed them by the defendant company, or for any other valuable consideration; or if you find that said company, so acting through its duly appointed and authorized agents, since said date, made, entered into and carried out a contract in this State with any of the persons named and as stated in plaintiff's petition, by the terms of which said parties bound and obligated themselves, for a valuable consideration, to buy all their oils from defendant company, and not to buy oils from any other source for any specified time, and not to sell said oils so bought from defendant company to any person handling or dealing in oils in competition with defendant company; or if said defendant company, so acting since said date, made and entered into and carried out in this State, a contract with any of the parties, as stated and named in plaintiff's petition, by the terms of which said parties, for a valuable consideration, bound and obligated themselves to said company, either verbally or in writing, to buy all their oils exclusively from defendant company, and from no other source, and to sell said oils so bought to other parties desiring to purchase the same at a price fixed by said company's officers or agents, and you further find that said sales of oils were not interstate commerce, as that is hereinafter explained to you, and that said officers or agents, so acting for said company in making said contracts, if any were so made, were acting in the scope of their employment and duty, and were authorized to make such contracts by the governing officers of said company, or that said governing officers, with a knowledge that said contracts had been made, consented to and ratified or carried out the same after they were made, then you are instructed that the defendant would be guilty of violating the law against trusts of this State; and if you so find the facts to be as above stated, you will return a verdict for the plaintiff against the defendant, Waters-Pierce Oil Company.

"11. You are further instructed that a corporation can only act

through its agents and servants, but a corporation is not liable for all the acts of its agents or servants. It is liable, however, for the acts of its agents done in the scope of their employment and agency, and is also liable for the acts of its agents which it has authorized such agents to perform, and it is also liable for the unauthorized acts of its agents which have been acquiesced in or ratified by the governing body of said corporation.

"12. Now if you find from the evidence that any or all of the contracts mentioned in section No. 10 of this charge, were made and carried out by the defendant company, acting through its agents with the parties therein named, but you do not find that said agents were authorized by the governing body of said corporation to make said contracts, nor that said contracts were made in the scope of the duty and employment of such agents, and do not find that said contracts, if any were made, were known to, or acquiesced in, or consented to by the governing body of said corporation, after being made by said agents, then you will return a verdict for the defendant company.

"13. But if you find said contracts mentioned in section No. 10 of this charge were entered into by the defendant company, acting through its agents, and that said agents were acting in the scope of their employment and agency in making said contracts, or, if said contracts were not authorized by the governing body of said corporation, that it acquiesced in or consented to or ratified said acts after knowing the same had been entered into, then said defendant company would be liable for such acts.

"14. You are further instructed that this court has no jurisdiction over, and the laws of this State do not apply to interstate commerce,—that is, to commerce between the different states of the United States. Shipments of oils or other products, made by the Waters-Pierce Oil Company from points without this State to its agents within this State is interstate commerce until such oils are sold by said company in the original packages in which it was shipped into this State, and as such is not subject to the laws of this State, regulating the sale thereof, and if the evidence introduced before you shows any of the contracts set out in plaintiff's petition were made in reference to interstate commerce. then you will not consider such contracts further, as the laws of this State do not cover such transactions; but, on the other hand, if the Waters-Pierce Oil Company shipped oils from points beyond this State to its agents, to points within this State, and after their receipt in this State the same were sold by said agents in this State, to parties in this State in broken packages or by retail, and not in the original packages in which said oils were shipped into this State, then such business is not interstate commerce, and is subject to the laws of this State; you are further instructed that, even though the contract may have reference to interstate shipments of oils, yet if the parties go farther and contract that such oils, after being sold by said Waters-Pierce Oil Company to parties in this State, shall be sold by said parties at a price fixed by the duly authorized agents of defendant company, then you are informed that such

dealing with said oils, after its sale to parties in this State, is not protected by the interstate commerce laws, but such contracts, if made, are subject to the laws of this State.

"15. You are instructed that the law against trusts in this State became a law on March 30, 1889, and was amended in 1895, and the defendant company obtained its permit to do business in this State on July 6, 1889, and all transactions in evidence before you, of date prior to July 6, 1889, are immaterial in this case, except where such contracts were continued and carried out subsequent to July 6, 1889, and for the purpose of showing the course of dealing of said company in this State, and such transactions prior to July 6, 1889, are no ground for forfeiture of defendant's permit to do business.

"16. There has been certain evidence introduced before you tending to show efforts and inducements offered by the agents of the defendant company to parties to handle oils of defendant company exclusively, and tending to show refusal of the agents of said company to sell parties handling other oils than those of defendant company, and of discrimination in prices against parties handling other oils than those of defendant company, and of cutting of prices by defendant company, to break down competition; none of these things are unlawful, and was only admitted as bearing upon the question of the course of dealing of defendant company in this State, and as bearing upon the question, whether or not the defendant company made or entered into the contracts, or any of them, as set out and mentioned in section number 10 herein, and as to whether or not such contracts or course of dealing, if any such there was, was known to the governing officers of the defendant company, or was authorized by them.

"17. There has been introduced in evidence before you a certain contract, known as the Standard Oil Trust agreement, and certain evidence tending to show that the defendant Waters-Pierce Oil Company became a member of and entered into said agreement; you are instructed that the evidence is not sufficient to show that defendant became a member of said organization, if at all, in a manner that violates the trust laws of this State, and you will, therefore, disregard all testimony upon this branch of the case.

"18. There has also been introduced in evidence before you certain evidence in regard to a contract made by the defendant company with the Eagle Refining Company, and also with C. W. Robinson, with J. L. Lewis and Stillwell Bros., in the State of Texas, by which they purchased the business of such concerns; you are instructed that such transactions as these are not believed to be in violation of the laws of this State, and the evidence in regard to these transactions will only be considered by you as bearing upon the course of dealing of defendant company in this State.

"19. The questions for you to determine in this case are:

"(1) Were any of the contracts mentioned in section 10 of this

charge made and entered into and carried out by the defendant company in this State, since July 6, 1889, acting through its agents.

"(2)   Whether such agents were acting in the scope of their authority and employment in making such contracts, or, if not, whether same were ratified or acquiesced in by defendant company after they were so made.

"(3)   Whether said contracts, if any, relate to interstate commerce or to business within this State.

"20.   In determining whether or not the agents of defendant company were authorized to make the contracts alleged, if any were so made, or whether same were known to or acquiesced in by defendant company's governing officers, the same does not necessarily have to be shown by positive or direct testimony, but may be shown by circumstances, and you will take into consideration all the facts and circumstances in evidence before you in determining this question.

"21.   You will return a verdict for the defendants Hathaway, Austin, Grice, Keenan, and Fries, as they are only the agents of defendant company and not liable in this suit.   If you find a verdict for the plaintiff, you will say, 'We the jury find for the plaintiff, the State of Texas, against the defendant, Waters-Pierce Oil Company, and in favor of the individual defendants,' naming them.   If you find for the defendant company, you will say, 'We the jury find for all the defendants, and that plaintiff take nothing by this suit.'

"22.   The burden of proof is on the plaintiff to show, by a preponderance of the evidence, the facts necessary to entitle it to recover.

"23.   The jury are the exclusive judges of the credibility of the witnesses, the facts proven, and the weight to be given the testimony, but are bound to receive the law from the court and be governed thereby."

A verdict was rendered for the State, against the Waters-Pierce Oil Company, but against the State in favor of Hathaway and the other defendants, upon which verdict judgment was entered denying to the Waters-Pierce Oil Company the right to do any business in Texas, and revoking and canceling its permit to do business in Texas, and perpetually enjoining said company and its agents from doing business in Texas, but adding this provision, by way of qualification, viz: "Nothing herein contained shall be construed to in any way affect or apply to or prohibit said defendant's right to engage in interstate commerce within this State."

*Opinion.*—It is needless for us to set out the evidence upon which we base our conclusions of facts, as it is sufficient for us to state that we find that there is evidence which tends to establish the combination of facts as set out in the tenth subdivision of the charge of the court, and that these facts constitute a violation of the anti-trust laws of this State; and that the appellant, through its agents, with knowledge of the facts, was connected with those transactions, and that there is some evidence which supports the two propositions of law given in the subsequent portion of

the fourteenth subdivision of the charge, which takes the conduct complained of out of the domain of interstate commerce.

From these conclusions, we find that the facts warrant the judgment rendered, and that it should not be disturbed, unless for some legal grounds affecting its validity. The appellant is a foreign corporation, domiciled in Missouri, engaged in the business of shipping and selling oils within this State, and there is some evidence which shows that they are dealing in oils as a business within this State.

The charge of the court sufficiently defines what, under the statutes of this State, is an illegal trust and combination, and we may add that the first act upon the subject, which went into effect March 30, 1889, exempted from its operation agricultural products and live stock, while in the hands of the producer and raiser; and the second act, which went into effect April 30, 1895, which was intended to repeal the Act of 1889 (and was in its general features much similar to that act), contained the same exemption as to agricultural products and live stock while in the hands of the raiser or producer, with also an exemption from its operation of labor organizations created for the purpose of maintaining a standard of wages. Both acts provide for a forfeiture of the charter of domestic corporations and of permit of foreign corporations to do business in this State, as a penalty for the infraction of the provisions of the statutes.

It is insisted that the statutes in question illegally infringe upon the liberty of the citizen to contract concerning his property, and deprive him of his property and impose restraints and burdens upon it, without due process of law. The fourteenth amendment to the Constitution of the United States, from which these rights flow, extends its benefits in these respects to corporations, as well as persons. Railway v. Beckwith, 129 U. S., 28; Turnpike Co. v. Sandford, 164 U. S., 592. But a consideration of these questions necessarily leads to the inquiry whether the statutes that are assailed arise out of an exercise of the general police authority of the State; for upon a solution of that question much depends the proper answer to be given to the contention of appellant.

The State may, in the exercise of its police power, legislate concerning many matters which, but for the authority in this respect, would be unauthorized. This power—generally stated as the "police power of the State"—extends to a variety of subjects which need not be enumerated, as it is generally admitted that matters and subjects which affect the general welfare and public interests are within the supervision of this power. The court in the case of Munn v. Illinois, 94 U. S., 124, speaking of this power, say: "But it does authorize the establishment of laws requiring each citizen to so conduct himself and so use his own property as not unnecessarily to injure another's. This is the very essence of government, and has found expression in the maxim, "sic utere tuo ut alienum non laedes." From this source come the police powers, which, as was said by Chief Justice Taney in the License Cases, 5 Howard, 583, "are nothing more or less than the powers of government, inherent in every sovereignty, * * * that is to say, * * * the power to govern men and

things." Under these powers, the government regulates the conduct of its citizens one towards another, and the manner in which each shall use his own property, when·such regulations become necessary for the public good."

"The State can now as before prescribe regulations for the health, good order, and safety of society, and adopt such measures as will advance its interests and prosperity." Railway v. Beckwith, 129 U. S., 29.

"The police power of the State is the authority vested in the Legislature to enact all such wholesome and reasonable laws * * * as they may deem conducive to public good." State v. Moore, 104 N. C., 71; same case, 17 Am. St. Rep., 698.

"All property is held subject to the power of the State to regulate or control its use, to secure the general safety and the public welfare. 'We think it is a settled principle,' says Chief Justice Shaw, in Commonwealth v. Alger, 7 Cushing, 84, 'growing out of the nature of well ordered civil society, that every holder of property, however absolute and unqualified may be his title, holds it under the implied liability that his use shall not be injurious to the equal enjoyment of others having an equal right to the enjoyment of their property, nor injurious to the rights of the community. All property is held subject to those general regulations which are necessary to the common good and general welfare.' Judge Redfield, in a passage often cited with approval, speaking of the police power, says: 'By this general police power of the State, persons and property are subjected to all kinds of restraints and burdens, in order to secure the general comfort, health, and prosperity of the State; of the perfect right of the Legislature to do which, no question ever was, or upon acknowledged general principles can be made.' Thorp v. Railway, 27 Vt., 140. The police power, so called, inheres in every sovereignty, and is essential to the maintenance of public order and the preservation of mutual rights from disturbing conflicts." Bertholf v. O'Reiley, 74 N. Y., 521.

The State in the exercise of this power in the selection of remedies looking to the suppression of evils harmful to its people, may apply them to the most sacred contracts and to the uses of property of every description, not in the way of an arbitrary spoliation or confiscation under a capricious exercise of the police power, but a useful regulation in the interest of the public welfare. Cool. Const. Lim., 6 ed., 707-720.

In enumerating the subjects which may be acted upon by the State in the exercise of its police power, Mr. Tiedeman, in his valuable work on Limitations of Police Powers, names combinations in restraint of trade, section 96; and as said in United States v. Freight Association, 166 U. S. 322: "Manufacturing or trading companies may also affect prices by joining together in forming a trust or other combination, and by making agreements in restraint of trade and commerce which, when carried out, affect the interests of the public."

This is certainly a just acknowledgement of the power, for there are few acts which individuals may engage in that are more harmful in their

effects upon the interests of the people generally than trusts and combinations concerning the commodities useful to mankind.

The rights of the individual must yield to the public wants, and his conduct and all property held by him is subject to the control of the State, to the end that he shall so demean himself and use his property with as little hurt and injury to the public as possible. "As said in Munn v. Illinois, 94 U. S., 113, while power does not exist with the whole people to control rights that are purely and exclusively private, government may require each citizen to so conduct himself, and so use his own property, as not unnecessarily to injure another." Mugler v. Kansas, 123 U. S., 660.

This is one of the inherent rights of sovereignty, and it is as much in place that it shall be exercised when the public interest requires, as it is the duty of the State, by stringent laws, to protect society from the depredations of the thief and the ravages of the murderer. When it is once admitted that a matter is a subject of police supervision, the expediency and wisdom of the means resorted to are subjects solely confided to the legislative department of the State, subject, however, to limitations imposed by the organic law of the nation in excluding from their jurisdiction, for many purposes, certain matters of control solely reserved to the national government,—such, for instance, as many of the matters relating to interstate commerce. It is not meant by this that a Legislature may conclusively declare a matter subject to its police authority, when in fact such is not the case—for that is a question which the courts may determine,—and under the guise of that power, by a system of confiscation and spoliation, which has no place in our government, deprive a citizen of his rights, but, as said before, when it is once determined that the subject dealt with really concerns the public welfare, it lies wholly within the police authority of the State, through its law makers, to determine how it shall be handled and dealt with. Railway v. Mathews, 165 U. S., 16.

By adequate laws looking to the suppression of evil, the State, through the exercise of its police power, must necessarily restrain the unbridled license of the citizen in his conduct and use of property, and restraints imposed in this way have never been held to illegally impair his liberty, as is attested from many of the provisions of the codes of this State and of others and the constructions that have been given to them. The freedom of speech, the liberty of person, and life itself must be surrendered, when the public interests and the order of good government so require. The liberty of the citizen, which embraces the legal right to his property, and to lawfully contract concerning it, stand upon no higher ground.

In Soon Hing v. Crowley, 113 U. S., 709, the court said: "The objection that the fourth section is void on the ground that it deprives a man of the right to work at all times is equally without force. However broad the right of everyone to follow such calling and employ his time as he may judge most conducive to his interests, it must be exercised

subject to such general rules as are adopted by society for the common welfare. All sorts of restrictions are imposed upon the actions of men notwithstanding the liberty which is guaranteed to each. It is liberty regulated by just and impartial laws." Crowley v. Christensen, 137 U. S., 89.

The objection to the statutes that they deprive the owner of his property without due process of law is equally untenable. It was not the design of the fourteenth amendment of the Constitution of the United States to interfere with a just and proper exercise of the police power by the States. Barbier v. Connolly, 113 U. S., 31; Davis v. Massachusetts, 167 U. S., 47. And when we determine, as we have, that the measures in question provided by these statutes were proper police regulations, we go far towards conclusively answering the objections to the statutes on the ground that they deprive the owners of their property, without due process of law. If legislative authority exists to restrain the conduct of owners in a particular way in the use of their property, deemed injurious to the public welfare, and the Legislature has acted in the manner required in passing laws, due process of law exists, in so far as it is necessary to find legal authority for prohibiting the act. Legal restraints imposed upon the use of property do not deprive the owner of it without due process of law: Railway v. Mathews, 165 U. S., 23; Railway v. Hume, 115 U. S., 519; Barbier v. Connolly, 113 U. S., 31; Walston v. Nevin, 128 U. S., 582; Railway v. Gibbs, 142 U. S., 387; Bertholf v. O'Reily, 74 N. Y., 519; Mugler v. Kansas, 123 U. S., 653.

In the case last cited, the Supreme Court, in passing upon a statute of Kansas which in effect deprived owners of intoxicating liquors of their right to pursue the avocation of selling and disposing of that class of property, at length reviewed this question, and also that aspect of those statutes which tended to interfere with the liberty of the citizen. The conclusion was reached that the matter was the subject of police regulation, and the restraints imposed upon the use of the property in the prohibited way did not illegally affect the liberty of the citizen or deprive him of his property without due process of law.

The statutes here in question do not arbitrarily, by legislative decree, ipso facto, operate upon the liberty of the citizen or upon his property, and deprive him of these rights, but provide for an orderly procedure in the courts of the State, with a right of the accused to be heard before being condemned. Whenever a burden is "imposed upon property for the public use, whether it be for the whole State, or some more limited portion of the community, and those laws provide for a mode of confirming or contesting the charge thus imposed in the ordinary courts of justice, with such notice to the person or such proceeding in regard to the property as is appropriate to the nature of the case, the judgment in such proceedings can not be said to deprive the owner of his property without due process of law." Davidson v. New Orleans, 96 U. S., 104.

The statutes are next assailed upon the ground that they are class legislation, and deny to certain citizens and classes equal protection of the

laws, and that the classification of subjects upon which the laws should bear, and those who are exempted from its operation, are purely capricious and arbitrary, in that there are no differences in the conditions of the classes which would justify the distinction made between them. Therefore, for this reason, it is contended that the statutes are obnoxious to the fourteenth amendment of the Constitution.

That the statutes in these respects are constitutional, has, in effect, been admitted by the courts of this State in the following cases: Brewing Association v. Houck, 27 S. W. Rep., 696; same case in 30 S. W. Rep., 869; Brewing Co. v. Templeman, 90 Texas 277; Fuqua v. Brewing Co., 90 Texas, 298.

We might be content with resting a disposition of this question upon these cases, but the gravity of the question and the earnestness with which the law is assailed command a more extended consideration of the subject. Of the many additional cases which may be cited, which by analogy sustain those noticed, are Fidelity and Casualty Co. v. Allibone, 90 Texas, 660; Insurance Co. v. Levy, 33 S. W. Rep., 992; Campbell v. Cook, 86 Texas, 634; Railway v. Mackey, 127 U. S., 209; Railway v. Beckwith, 129 U. S., 29; Railway v. New York, 165 U. S., 633; Express Co. v. Seibert, 142 U. S., 353; Railway v. Hume, 115 U. S., 519; Soon Hing v. Crowley, 113 U. S., 708; Barbier v. Connolly, 113 U. S., 31; Crowley v. Christensen, 137 U. S., 89; Hays v. Minnis, 120 U. S., 68; Bank v. Penn, 167 U. S., 462; Railway v. Mathews, 165 U. S., 23; Powell v. Pennslyvania, 127 U. S., 687; State v. Moore, 17 Am. St. Rep., 697, 104 N. C., 714.

In discussing the great mass of case law which touches upon this subject, those that relate to railways as a class of carriers are sufficient as a basis for demonstrating our views. It is true that many of these cases which recognize the right of the Legislature to classify railways as a special subject of legislation and impose duties, burdens, and restrictions upon them which are not imposed upon other carriers, are based upon the principle that they are public corporations and engaged in a public business, and that further, on account of the dangerous character of their business and by reason of benefits received, the power exists to impose duties and burdens upon them which are not applied to other carriers. But really, the true principle and doctrine upon which legislation of this character is bottomed, as affecting railways as a class, is that the public interests and welfare require that in the use of their property and the performance of their business it be conducted in a way least harmful to the public and most beneficial thereto consistent with the right of ownership in the property. It is the public interest and welfare that is involved in the business they carry on and conduct that really gives the State, in the exercise of its police power, jurisdiction over their affairs. Now, the general welfare of the people is no more important to be observed in restraining and controlling railways in their relation to the commerce of the country than is the public interest to be subserved by laws which restrain and prevent trusts and combinations concerning

such commerce, and which seek to prevent conspiracies entered into for the purpose of affecting the prices of commodities which are useful and necessary to the enjoyment of life. In each case the interest of mankind requires that the selfishness of human nature, which seeks alone to advance its individual interests, shall, in the use of property and in conduct, be so far restrained, as may be compatible with individual right and liberty, as will prevent harm and injury to the public.

The cases of Campbell v. Cook, Railway v. Mackey, Railway v. Mathews, and Railway v. Beckwith, supra, are instances of legislation creating and enforcing regulations concerning only railways as a class of carriers. They were not applied to other carriers. But the statutes operated with equal effect upon all railways.

In these cases the rule laid down in Barbier v. Connerly, 113 U. S., 31, was applied, to the effect that "regulations for these purposes may press with more or less weight upon one than upon another, but they are designed not to impose unequal or unnecessary restrictions upon one, but to promote, with as little individual inconvenience as possible, the general good. Though in many respects necessarily special in their character, they do not furnish just ground of complaint if they operate alike upon all persons and property under the same circumstances and conditions. Class legislation discriminating against some and favoring others is prohibited, but legislation which in carrying out a public purpose is limited in its application, if within the sphere of its operation it affects alike all persons similarly situated, is not within the amendment."

The view of the court in these and similar cases, is fully illustrated by what is said in Railway v. Mackey, 127 U. S., 205, where a statute making railway corporations liable for damages resulting to employes by reason of the negligence of their fellow servants was held constitutional. "The hazardous character of the business of operating railways would seem to call for special legislation with respect to railroad corporations having for its object the protection of their employes as well as the safety of the public. The business of other corporations is not subject to similar dangers to their employes, and no objections, therefore, can be made to the legislation on the ground of its making an unjust discrimination. It meets a particular necessity, and all railroad corporations are, without discrimination, made subject to the same liabilities. As said by the court below, it is simply a question of legislative discretion whether the same liabilities shall be applied to carriers by canal and stage coaches and to other persons and corporations using steam in manufactories."

The Legislature, in the pursuit of its police power, in selecting subjects upon which it shall bear, can not capriciously and arbitrarily classify those subjects, and impose burdens on some and relieve others, when in the nature of things they are similarly situated and no reason could exist for the distinction. But, viewing the subject of classification from any standpoint, if reasons for the distinction can in any event exist the legislation must be credited with being founded upon it. Doubtless the several Legislatures, in passing statutes regulating railways as

a distinct class of carriers, evidently contemplated that, from the magnitude of the service in which they were engaged and the relations they bore to the public and the injury that might result to the public welfare if they were not restrained, requiring rules and regulations for their conduct which were not necessary to be applied to other carriers because of their limited capacity and extent, the public were not so much concerned with the conduct of their business, and that they were not so situated as to seriously, in these particulars, affect or injure the public. It is not the duty of the State to discover the reasons and circumstances upon which these laws may rest, but the burden is upon the appellant to demonstrate that the classification was capricious and unauthorized.

We can not say that the law upon its face establishes its want of reason, or that circumstances and conditions existing in this State, in relation to the subjects dealt with in the acts and the evils sought to be suppressed, did not authorize the classification made in the statutes. This view might relieve us of any duty looking towards a discovery of reasons which might have been in the legislative mind for the distinction and classification. The law is not palpably in violation of the fourteenth amendment of the Constitution, but whether it is so, depends much upon the facts and conditions existing at the time which would make it unjust to discriminate between the classes. In the absence of such facts showing the contrary, the presumption would be in favor of its constitutionality. State v. Moore, 17 Am. St. Rep., 698; State v. Addington, 77 Mo., 117; Powell v. Pennsylvania, 127 U. S., 685.

The domestic welfare of the people of this State is within the keeping of its Legislatures, and they are supposed to best know their wants and necessities, and the policy that shall govern its internal affairs, and the remedies needful in the pursuit of this policy and that are necessary in order to extinguish or prevent evil and harmful conditions affecting the general interest and the public welfare. These are matters political and relate to the economic affairs of government, and are peculiarly within the knowledge of the law-making department thereof. The remedies, therefore, lie within the legislative province and are, to some extent, confided to their discretion and wisdom. Hennington v. Georgia, 163 U. S., 304; Powell v. Pennsylvania, 127 U. S., 684. In this last case it is said "Every possible presumption is in favor of the validity of a statute, and this continues until the contrary is shown beyond a rational doubt."

In the pursuit of this policy conditions might exist which would justify the Legislature in creating and providing remedies adequate to suppress the evil, when applied to one class of subjects, which might not, in their opinion, be necessary to be applied to other classes. For the danger to the public welfare from the pursuit of the evil by the one class may be of such magnitude and lead to such disastrous consequences that corrective measures are absolutely essential to the order of good government and to the repose and stability of society; while, upon the other hand, the danger in these respects from the excluded classes may be inappreciable

and the acts denounced so difficult of consummation at their hands in injurious effects upon the welfare of the people that corrective measures are not necessary to be applied to them. Now, combinations and trusts in restraint of trade and the existence of monopolies which place it within the power of those combining to affect and elevate the prices of commodities in use by the peoples of the world for their enjoyment and necessities are harmful to the welfare of the public whenever and wherever such conditions are permitted to exist. With a knowledge of this fact within the mind of the law makers, the Legislature of this State, in the light of history, and with a knowledge of current events, may, with much reason, have concluded that the danger from trusts and combinations which in their operation would injuriously affect the people would be at the hands of the buyer and seller and dealer in commodities, and not at the hands of the producers, and that by reason of the generally admitted necessity of the producers to readily and speedily dispose of their products and the difficulties in their way to a successful combination relating to the disposition of their products, little if any danger to the public would be apprehended from that source. The Legislatures of the State are supposed to have acted in this matter intelligently and with a knowledge of the conditions and dangers confronting the people from combinations and trusts; and it requires little enlightenment to discover that, at the time these laws were passed and now, the disturbing classes which were and now are so injuriously affecting the public welfare are the buyers, sellers, and dealers in the articles in use by the people of this State. The unbridled license of these classes which in many instances was exercised, had, within this State as well as other sections of the country, assumed such proportions that the danger to the welfare of the people was so apparent that the layman as well as the lawgiver could discern it.

Whatever condition may exist elsewhere concerning the conduct of the producing class in affecting through combinations the prices of their productions, it can not be said to exist in this State, if at all, to any appreciable extent, at least not to such an extent as to be an evil of such proportions as to necessarily require corrective measures for its suppression. All these facts were known to the Legislature and evidently influenced them in selecting the subjects to which the law should apply. Plessy v. Furgeson, 163 U. S., 550. And as said in Railway v. Mackey, supra, "It was simply a matter of legislative discretion, whether the same liabilities" should be applied to the classes which were exempted from the operation of the statute. This case is quoted with approval by the recent case of Railway v. Mathews, 165 U. S., 25.

The conditions of the classes embraced in the act and those excluded are not altogether similar, and there are many distinguishing features between the two which suggest the power in the one to successfully combine and which deny it to the other. The infant twenty years of age may possess the mental requisites to contract as one sui juris, and may as well

understand the responsibilities of citizenship, and be as capable of intelligently exercising the functions of office and the duties of a citizen as an adult.    The adult female often possesses as much intelligence as man, and appreciates the rights and duties of citizenship, and possesses a knowledge of the affairs of government; but in these instances a distinction is observed between their rights, on the one hand, and those of adults and males on the other.    But in those cases, the power of the lawmakers to confer privileges upon the one class and deny them to the other has never been successfully questioned.    But they are as much within the protection of the fourteenth amendment to the Constitution as those of other classes.    It is somewhat difficult to perceive why mechanics, as a class of laborers, should be entitled to more privileges and advantages than are conferred upon other classes of laborers and servants.    But laws of this class, which provide means for mechanics in the collection of their debts, are not extended to other classes of laborers; and, as said in Railway v. Mackey, such statutes are not obnoxious to the fourteenth amendment.

These are simply haphazard illustrations that have just occurred to us, of many that could be given, showing the power of the lawmakers to classify subjects when, in their wisdom and discretion, reasons therefor may be suggested to them which, when viewed from the standpoint of some other body of lawmakers or of some court which may be called to pass upon such statutes, may not be fully understood or appreciated.

The learned counsel for appellant, in their most able presentation of this question in their brief, contend that the views here expressed are opposed to the case of Railway v. Ellis, 165 U. S., 150.

That case does not conflict with the views we entertain upon this subject.    It is distinguishable upon the ground that there it was held that the Legislature did not have the power to arbitrarily and capriciously, without reason, distinguish between classes similarly situated.    We do not oppose this view, but hold, as we have endeavored to show, that the classification made by the law in question was not of the character denounced in the case cited.

If the clause in the Act of 1895 which exempts from its operation labor organizations for the purpose of maintaining their wages would render that statute obnoxious to the fourteenth amendment to the Constitution, which we do not think to be the case, the entire act would be void and could not operate as a repeal of the former law of 1889; so that if it should be determined that this latter act was unconstitutional, the former act would be in force, and would not be subject to the objections urged against it, for the reasons stated by us in passing upon these objections; and therefore the State could maintain a case under this act.

In response to the first proposition urged under the fourth, eighteenth, twenty-sixth, and forty-second assignments of errors, it is sufficient to say that the petition went further than simply charging the appellant with transporting and shipping into Texas its oils; but in effect charged that it was engaged in business in Texas, in disposing of oils, and had

made and entered into contracts and agreements with various merchants within this State, and others dealing in oils, to buy and sell the oils of the defendant exclusively; and further agreed not to sell the oils so bought from the defendant company to anyone buying from or dealing with any other corporation, or person, dealing in competitive oils. These allegations in effect allege that the appellant was actually engaged in business within this State, and had made and entered into such contracts with reference to the handling, disposition, and sale of oil in this State with merchants and local dealers, of the character denounced in the case of Fuqua v. Brewing Co., 90 Texas, 298.

In response to the second proposition under these assignments, it can be said that it does not conclusively appear that all of the transactions testified about by the witnesses, occurring between the appellant and certain merchants at Brownsville, Texas, related solely to interstate commerce. There were some facts testified about by these witnesses which made it proper for the jury to consider what was the nature and effect of the transactions that occurred at Brownsville. It would have been improper for the court to have given the charge requested by the appellant upon this subject. Where there is any evidence, however slight it may be, the court must leave it to the consideration of the jury.

The court, in rendering its judgment canceling and forfeiting the permit of the appellant, provided that it should not relate to and interfere with the right of appellant, in dealing in matters of interstate commerce. The appellant, in its third proposition under these assignments, complains of this judgment, because, as the statute provides for a forfeiture of the permit, the court had no power to render judgment forfeiting the permit so as to apply to dealing in oils locally within this State. The contention is that, as the statute required a forfeiture of the permit to do business in all respects, the court had no power to limit that right in its judgment.

It was decided in the case of Fuqua v. Brewing Co., supra, that it was not the purpose of these statutes to undertake in any way to regulate or to prohibit transactions of interstate commerce, and it was clearly proper for the court to give to the statute this application. If the statute could be applied to domestic commerce and transactions occurring within the limits of this State, the court could give it application, and its inability to extend it to matters of interstate commerce would not affect its power in this respect.

It is contended in the eighth assignment of error that it was not competent for the State to impair the contract authorizing the appellant to do business in this State. After the Act of 1889 went into effect, the State granted to appellant authority to engage in its business within this State for a period of ten years. The Act of 1889, as well as that of 1895, provides for the forfeiture of the permit of a foreign corporation which may violate any of the provisions of the statute. Except where the foreign corporation is in the employ of the Federal government or is engaged strictly in matters of interstate commerce, such bodies are entitled

to no rights or privileges except those which may be conferred upon them as an act of grace by the State. Mining Co. v. Penn, 125 U. S., 173.

The laws of the State which apply to domestic corporations and individuals in prohibiting certain conduct apply with equal force to foreign corporations. The State, in granting them privilege to do business, does not absolve ·them from responsibility and contract to relieve them from the operation of laws which expressly apply to them. The act in force when the appellant entered this State informed it that for a violation of its terms the permit to do business here would be forfeited. This provision of the law was as much a part of obligation and as binding upon the appellant as if it had been expressly made a part of the permit. But there is another ground upon which this question may rest. The police power of the State can not be bartered away, and there exist no contractual rights which are not subject to its exercise. Speaking of police powers, Judge Cooley, in his work on Constitutional Limitations, section 707, says: "The occasion to consider this subject in its bearing upon the clause of the Constitution of the United States which forbids the States from passing any laws impairing the obligation of contracts, has been frequent and varied, and it has been held without dissent that this clause does not so far remove from State control the rights and properties which depend for their existence or enforcement upon contracts as to relieve them from the operation of such general regulations for the good government of the State and the protection of the rights of individuals as may be deemed expedient. All contracts and all rights are subject to this power, and not only may regulations which affect them be established by the State, but all such regulations must be subject to change from time to time, as the general well being of the community may require, or as circumstances may change, or as experience may demonstrate the necessity." Mugler v. Kansas, 123 U. S., 669. And this principle is applicable to charters of corporations. Cool. Const. Lim., sec. 709; Railway v. Mathews, 165 U. S., 18-25.

We can not agree with the appellant that it could not become bound by the acts of its agents performed in this State within the scope of their duty, because the conduct complained of, for which the State is seeking to make it responsible for the acts of its agents, involves a criminal responsibility in addition to their civil liability; and does not interpose any objection to the application of the principles of the law of agency which would make the appellant responsible to the State for a violation and infraction of its laws which it was guilty of through its agents while performing their duty with reference to the business confided to them. Meecham on Agency, secs. 745, 746; George v. Gobey, 128 Mass., 289. The charge of the court on the subject of agency was correct, it did not trench upon the province of the jury, and stated what we understand to be the correct rule upon that subject.

In reply to the twenty-fourth and twenty-fifth assignments of error, we think there was testimony authorizing the instructions given by the court complained of. There is evidence which tends to show that such

combinations and agreements were entered into as were violative of the spirit and meaning of the anti-trust statutes, and the evidence shows that these agreements were entered into by appellant through its agents, and there is some testimony which tends to connect the appellant with this conduct,—that it knew of it.   The fact that reports were made to it by these agents tends to establish that it had knowledge of these contracts and the violation of the law in the respect complained of by the State, and that it accepted the fruits and benefits of these agreements.

The evidence complained of, in the twenty-second, twenty-seventh twenty-eighth, twenty-ninth, thirtieth, thirty-second, thirty-third, and thirty-fifth assignments of errors was admissible, controlled as it was by the charge of the court, which is also complained of.   It tended to show, as a circumstance bearing upon the main issues in the case, the method of doing business in this State by the appellant.   One principal reason why this testimony was admitted was for the purpose of showing that the appellant had knowledge of the transactions complained of by the State, that had some bearing and relation to that question.   They were transacted by the trusted agents of the appellant, and we can not assume that the appellant did not have notice of this conduct; but, as said before, there are some facts which tend to indicate that it did have notice and received the benefits of the transactions and agreements entered into by the agents with the local merchants of this State.

The court did not err in admitting the testimony of witness Dugger, nor did it err in refusing to admit the evidence of witness Grice, as complained of in the thirty-first and thirty-sixth assignments of errors.   Nor did it err in refusing to admit the testimony of witness Pierce, as set out in the thirty-eighth assignment of error, nor did it err in the ruling complained of in the thirty-ninth assignment of error.

No extended discussion is required upon the rulings complained of by these assignments, and it is sufficient to say that we have given them the consideration which their importance demands, and we reach the conclusion announced.

It is further contended, although the question is not properly raised, that the appellant was entitled to a charge to the effect that the jury must find in its favor unless its guilt of the conduct complained of was established beyond a reasonable doubt.   Whatever may be the rule that exists in other jurisdictions, we do not think a charge of that nature would have been applicable in this case.   This is a civil controversy; and as has been previously said by this Court in an opinion in which a number of cases were cited, "In no controversy of a civil nature would it be proper for the courts of this State to give such a charge."   Pace v. Mortgage Co., 43 S. W. Rep., 36.

We find no error in the record and the judgment is affirmed.

*Affirmed.*

Writ of error refused.