## EX PARTE HERBERT TIGNER.

No. 19333.  Delivered June 23, 1939.
Rehearing Denied November 15, 1939.
Appealed to Supreme Court of United States and Affirmed.

454

The opinion states the case.

*Barksdale Stevens, K. C. Barkley, W. H. Scott, Wilber B. Hunt, W. H. Colbert,* and *Herbert G. Tigner,* all of Houston, for appellant.

*C. K. Bullard,* of Dallas, and *Dan Moody,* of Austin, amici curiae.

*Dan W. Jackson,* Criminal District Attorney, and *Chas. E. Kamp* and *Spurgeon E. Bell,* Assistant Criminal District Attorneys all of Houston, and *Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

CHRISTIAN, Judge.

Appellant has been charged by indictment with entering into a conspiracy to fix the retail price of beer in violation of the provisions of Chapter 3, Title 19, Penal Code of the State of Texas, 1925. After his arrest and incarceration, he presented a petition to the Honorable Langston G. King, Judge of Criminal District Court No. 2 of Harris County, Texas, praying that a writ of habeas corpus issue to the end that he might be discharged from custody. The writ was issued, a hearing was had, and appellant was thereafter remanded to custody. The case is here on appeal.

It is the contention of appellant that the statute under which he is indicted is repugnant to the equal protection clause of the Fourteenth Amendment of the Constitution of the

United States because of Article 1642, hereinafter quoted, which excludes from the operation of the statute agricultural products and live stock while in the hands of the producer or raiser. In considering this contention we deem it appropriate to set the statute out at length. It provides:

"Article 1632. A 'trust' is a combination of capital, skill or acts by two or more persons, firms, corporations or associations of persons, or either two or more of them for any or all of the following purposes:

"1. To create, or which may tend to create or carry out, restrictions in trade or commerce or aids to commerce, or in the preparation of any product for market or transportation, or to create or carry out restrictions in the free pursuit of any business authorized or permitted by the laws of this State.

"2. To fix, maintain, increase or reduce the price of merchandise, produce, or commodities, or the cost of insurance, or of the preparation of any product for market or transportation.

"3. To prevent or lessen competition in the manufacture, making, transportation, sale or purchase of merchandise, produce, or commodities, or the business of insurance, or to prevent or lessen competition in aids to commerce, or in the preparation of any product for market or transportation.

"4. To fix or maintain any standard or figure whereby the price of any article or commodity of merchandise, produce or commerce, or the cost of transportation, or insurance, or the preparation of any product for market or transportation, shall be in any manner affected, controlled or established.

"5. To make, enter into, maintain, execute or carry out any contract, obligation or agreement by which the parties thereto bind, or have bound, themselves not to sell, dispose of, transport or to prepare for market or transportation any article or commodity, or to make any contract of insurance at a price below a common standard or figure, or by which they shall agree, in any manner, to keep the price of such article or commodity, or charge for transportation or insurance, or the cost of the preparation of any product for market or transportation, at a fixed or graded figure, or by which they shall, in any manner, affect or maintain the price of any commodity or article, or the cost of transportation or insurance, or the cost of the preparation of any product for market or transportation, between them or themselves and others, to preclude a free and unrestricted competition among themselves or others in the sale or transportation of any such article or

commodity or business of transportation or insurance, or the preparation of any product for market or transportation, or by which they shall agree to pool, combine or unite any interest they may have in connection with the sale or purchase of any article or commodity, or charge for transportation or insurance, or charge for the preparation of any product for market or transportation, whereby its price or such charge might be in any manner affected.

"6. To regulate, fix or limit the output of any article or commodity which may be manufactured, mined, produced or sold, or the amount of insurance which may be undertaken, or the amount of work that may be done in the preparation of any product for market or transportation.

"7. To abstain from engaging in or continuing business, or from the purchase or sale of merchandise, produce or commodities partially or entirely within this State, or any portion thereof."

"Art. 1633. A 'monopoly' is a combination or consolidation of two or more corporations when affected in either of the following methods:

"1. When the direction of the affairs of two or more corporations is in any manner brought under the same management or control for the purpose of producing, or where such common management or control tends to create a trust as defined in the first article of this chapter.

"2. Where any corporation acquires the shares or certificates of stock or bonds, franchise or other rights, or the physical properties, or any part thereof, of any other corporation or corporations, for the purpose of preventing or lessening, or where the effect of such acquisition tends to affect or lessen competition, whether such acquisition is accomplished directly or through the instrumentality of trustees or otherwise."

"Art. 1634. Either or any of the following acts shall constitute a conspiracy in restraint of trade :

"1. Where any two or more persons, firms, corporations or associations of persons, who are engaged in buying or selling any article of merchandise, produce or any commodity, enter into an agreement or understanding to refuse to buy from or sell to any person, firm, corporation or association of persons, any article of merchandise, produce or commodity.

"2. Where any two or more persons, firms, corporations or associations of persons, shall agree to boycott or threaten to refuse to buy from or sell to any person, firm, corporation or

association of persons for buying from or selling to any other person, firm, corporation or association of persons."

"Art. 1635. Whoever violates any provision of this chapter shall be confined in the penitentiary for not less than two nor more than ten years."

"Art. 1636. Upon the application of the Attorney General or of any of his assistants, or of any district or county attorney, acting under the direction of the Attorney General, made to any county judge, or any justice of the peace, in this State, stating that he has reason to believe that a witness, who is to be found in the county in which such judge or justice is an officer, knows of a violation of any provision of this chapter, it shall be the duty of such judge, or justice, before whom such application is made, to have summoned and examined such witness in relation to violations of any provision of this chapter, said witness to be summoned as in criminal cases. The said witness shall be duly sworn; and the judge or justice shall cause the statements of the witness to be reduced to writing and signed and sworn to before him; such sworn statement shall be delivered to the attorney upon whose application the witness was summoned. Should the witness so summoned fail to appear or to make statements of the facts within his knowledge under oath, or to sign the same after it has been reduced to writing, he shall be guilty of contempt of court, and may be fined not exceeding one hundred dollars, and may be attached and imprisoned in jail until he makes a full statement of all the facts within his knowledge with reference to the matter inquired about. Any person who shall testify before any judge or justice as provided for in this chapter, or who shall testify as a witness for the State in the course of any statutory proceeding to secure testimony for the enforcement of this law, or in the course of any judicial proceeding to enforce the provisions of this chapter, shall not be subject to indictment or prosecution for any transaction, matter or thing concerning which he shall so give evidence, documentary or otherwise."

"Art. 1637. If any person shall enter into an agreement or understanding of any character to form a trust, or to form a monopoly, or to form a conspiracy in restraint of trade, as these offenses are defined in this chapter, or shall form a trust, monopoly or conspiracy in restraint of trade, or shall be a party to the formation of a trust or monopoly or conspiracy in restraint of trade, or shall become a party to a trust or mo-

nopoly or conspiracy in restraint of trade, or shall do any act in furtherance of or aid to such trust or monopoly or conspiracy in restraint of trade, he shall be confined in the penitentiary not less than two nor more than ten years."

"Art. 1638. If any person, shall, as a member, agent, employee, officer, director or stockholder of any business, firm, corporation or association of persons, form, in violation of the provisions of this chapter, or shall operate, in violation of such provisions, any such business, firm, corporation or association formed in violation of this chapter, or shall make any sale, or purchase, or any other contract, or do business for such business, firm, corporation or association, or shall do any other act which has the effect of violating or aiding in the violation of any provision of this chapter, or shall, with the intent or purpose of driving out competition or for the purpose of financially injuring competitors, sell within this State at less than cost of manufacture or production, or sell in such a way or give away within this State, products for the purpose of driving out competion or financially injuring competitors engaged in a similar business, or give secret rebates on such purchase for the purpose of the aforesaid, he shall be confined in the penitentiary not less than two nor more than ten years."

"Art. 1639. If any person, shall, outside of this State, do anything which, if done within this State, would constitute the formation of a trust or monopoly or conspiracy in the restraint of trade, as defined in this chapter, and shall cause or permit the trust or monopoly so formed by him to do business within this State, or shall cause or permit such trust, monopoly, or conspiracy in restraint of trade to have any operation or effect within this State, or, if such trust, monopoly or conspiracy in restraint of trade, having been formed outside of said State, any person shall give effect to such trust, monopoly or conspiracy, in this State, or he shall do anything to help or aid it doing business in this State, or otherwise violate the anti-trust laws of this State, or if any person shall buy or sell or otherwise make contracts for or aid any business, firm, corporation or association of persons, formed or operated in violation of any provision of this chapter, or so formed or operated as would be in violation of the laws of this State, if it had been formed within this State, shall be confined in the penitentiary not less than two nor more than ten years."

"Art. 1640. If any person, employe, agent, stockholder, or officer of any person, firm, association of persons, or corporation, now doing business in this State, have formed a trust, or monopoly, as defined in this chapter, or have formed a conspiracy in restraint of trade, as defined in this chapter, or shall do or perform any act of any character to carry out such trust, monopoly or conspiracy in restraint of trade, such person, employe, agent, stockholder, or officer, shall be confined in the penitentiary not less than two nor more than ten years."

"Art. 1641. Prosecutions under this chapter may be conducted in Travis County, or in any county wherein a trust, monopoly or conspiracy in restraint of trade is being carried on."

"Art. 1642. No provision of this law shall apply to agricultural products or live stock while in the hands of the producer or raiser. It shall be lawful for any person engaged in any kind of work or labor, manual or mental, or both, to associate with other such persons to form trades unions and other organizations for the purpose of protecting themselves in their personal work, personal labor, and personal service, in their respective pursuits and employments."

"Art. 1643. It shall be lawful for any members of such trades union or other organizations or associations, or any other person, to induce or attempt to induce, by peaceable and lawful means, any person to accept any particular employment, or quit any particular employment in which such person may then be engaged, or to enter any pursuit, or refuse to enter any pursuit, or quit any pursuit, in which such person may then be engaged. No such member shall have the right to trespass upon the premises of another without the consent of the owner thereof."

"Art. 1644. The foregoing article shall not be held to apply to any combination or combinations, association or associations of capital, or capital and persons, natural or artificial, formed for the purpose of limiting the production or consumption of labor's products, or for any other purpose in restraint of trade. Nothing herein contained shall be held to interfere with the terms and conditions of private contracts with regard to the time of service, or other stipulations between employers and employes. Nothing herein shall be construed to repeal, affect or diminish the force and effect of any statute now exist-

ing on the subject of trusts, conspiracies against trade, pools and monopolies."

In the case of Connolly v. Union Sewer Pipe Company, 184 U. S. 540, 46 L. ed. 679, which was decided more than thirty seven years ago, the Supreme Court of the United States held that a trust statute of the State of Illinois was invalid because it excluded from its operation "agricultural products or live stock while in the hands of the producer or raiser." If the decision in that case is to be regarded as determinative, appellant should be ordered discharged without further discussion of the question presented in this appeal. For reasons which will later appear, we have reached the conclusion that the question should receive fresh consideration.

Adverting to the history of the litigation of the question in the State courts prior to the decision in the Connolly Case, it is observed that the first anti-trust statute of this State was enacted in 1889. It embraced a provision exempting from its operation agricultural products or live stock while in the hands of the producer or raiser. The same exemption was made a part of the anti-trust act of 1895, which also carried an exemption in favor of laborers, organized for the purpose of maintaining a "standard of services." In 1894, the anti-trust act of 1889 came before the Court of Civil Appeals of the Fourth Supreme Judicial District of the State in the case of Anheuser-Busch Brewing Association v. Houck, 27 S. W. 692. In sustaining the exemption relating to agricultural products and live stock, the court said: "It is apparent that all persons, of every class, upon whom the act professes to operate are treated without distinction. This feature of a general statute is held to be the test of whether it is or not obnoxious to that objection, and we believe the act to be valid." When the case was considered by the Supreme Court of Texas the classification was again sustained, the court saying: "For the reasons given by the Court of Civil Appeals, we also agree with them in holding that the act is not in violation of the Constitution." Houck v. Brewing Association, 88 Texas 184. In 1898 the anti-trust act of 1895 was considered by the Court of Civil Appeals of the Third Supreme Judicial District of the State in the case of Waters-Pierce Oil Company v. State, 44 S. W. 936. In overruling the contention that the classification was repugnant to the equal protection clause of the Fourteenth Amendment, the court said:

"The domestic welfare of the people of this state is within the keeping of its legislatures, and they are supposed to best

know their wants and necessities, and the policy that shall govern its internal affairs, and the remedies needful in the pursuit of this policy, and that are necessary in order to extinguish or prevent evil and harmful conditions, affecting the general interest and the public welfare. These are matters political, and relate to the economic affairs of government, and are peculiarly within the knowledge of the lawmaking department thereof. The remedies, therefore, lie within the legislative province, and are, to some extent, confided to their discretion and wisdom. * * *

"In the pursuit of this policy, conditions might exist which would justify the legislature in creating and providing remedies adequate to suppress the evil, when applied to one class of subjects, which might not, in their opinion, be necessary to be applied to other classes; for the danger to the public welfare from the pursuit of the evil by the one class may be of such magnitude, and lead to such disastrous consequences, that corrective measures are absolutely essential to the order of good government, and to the repose and stability of society, while, upon the other hand, the danger in these respects from the excluded classes may be inappreciable, and the acts denounced so difficult of consummation at their hands, in injurious effects upon the welfare of the people, that corrective measures are not necessary to be applied to them. Now, combinations and trusts in restraint of trade, and the existence of monopolies, which place it within the power of those combining to affect and elevate the prices of commodities in use by the peoples of the world for their enjoyment and necessities, are harmful to the welfare of the public, whenever and whereever such conditions are permitted to exist. With a knowledge of this fact within the mind of the lawmakers, the legislature of this state, in the light of history, and with a knowledge of current events, may, with much reason, have concluded that the danger from trusts and combinations, which in their operation would injuriously affect the people, would be at the hands of the buyer and seller and dealer in commodities, and not at the hands of the producers, and that, by reason of the generally admitted necessity of the producers to readily and speedily dispose of their products, and the difficulties in their way to a successful combination, relating to the disposition of their products, little, if any, danger to the public could be apprehended from that source. The legislatures of the state are supposed to have acted in this matter intelligently, and with a knowledge of the conditions and dangers confronting the people from combinations and trusts; and it requires little

enlightenment to discover that at the time these laws were passed, and now, the disturbing classes, which were and now are so injuriously affecting the public welfare, are the buyers, sellers, and dealers in the articles in use by the people of this state. The unbridled license of these classes, which in many instances was exercised, had, within this state, as well as other sections of the country, assumed such portions that the danger to the welfare of the people was so apparent that the layman as well as the lawgiver could discern it."

The Supreme Court of the State denied the application of the oil company for a writ of error, thereby sustaining the validity of the statute. In the case of State v. Compress Company, 95 Texas 603, the Supreme Court of the State, in giving effect to the decision in the Connolly Case, held the anti-trust statute of 1895 to be in conflict with the Fourteenth Amendment. In the course of the opinion the court said: "The defendant insists that the law is unconstitutional, and therefore void in whole, and will not support the action to forfeit the charter. Upon the same objection we held the anti-trust law of 1889 to be constitutional, and there is no such difference between the two laws as would affect the decision of this question. We believe that our decision is correct,—that the law is not in contravention of the Constitution of the State nor of the United States. Houck v. Brewing Assn., 88 Texas 189. In the case of Connolly v. The Union S. and P. Co., 22 Supreme Court Reporter, 431, the Supreme Court of the United States held that a statute of the State of Illinois, in all essential particulars the same as the Act of 1895, was in conflict with the fourteenth amendment to the Constitution of the United States, because it excepted 'agricultural products and live stock while in the hands of the producer or raiser.' We recognize the superior authority of the Supreme Court of the United States upon this question, and in obedience to its decision, we shall hold that in so far as the law of 1895 comes within the terms of the Connolly case, it is invalid; * * *"

Approximately two years prior to the decision in the Connolly Case the Supreme Court of Tennessee, in State v. Schlitz Brewing Company, 59 S. W. 1033, upheld the anti-trust statute of that state against the contention that it offended against the equal protection clause of the Fourteenth Amendment in exempting from its provisions "agricultural products or livestock while in the possession of the producer or raiser." In the course of the opinion the court said: "Allowing that all persons, natural and artificial, are alike ambitious of financial

gain, and equally willing to acquire it through the means reprehended so distinctly in this act, it is nevertheless true that farmers and stock raisers in this state, when acting within their limited sphere of immunity from those penalties, have at most but few opportunities and slight facilities for impairing competition and controlling prices, while those of many of the other pursuits have such opportunities and facilities almost without limit. This difference, alone, to say nothing of others that may have been in the minds of the legislators, is amply sufficient to justify the classification made, and place it beyond judicial review."

The principle that a state may classify with reference to an evil to be prevented is well established in the decisions of the Supreme Court of the United States. See Radice v. New York, 264 U. S. 292, 68 L. ed. 691. It was applied by the court in Carroll v. Greenwich Insurance Company, 199 U. S. 401, 50 L. ed. 246, (decided November 27, 1905) in reaching the conclusion that a statute of the State of Iowa making it unlawful for two or more fire insurance companies doing business in the state to enter into any conspiracy or agreement relating to the rates to be charged for insurance, the amount of commission to be allowed agents for procuring insurance, or the manner of transacting the fire insurance business, did not present a case in which there was no justification for the selection of fire insurance companies for its prohibitions. It was later invoked in Patsone v. Commonwealth of Pennsylvania, 232 U. S. 138, 58 L. ed. 539, (decided January 19, 1914) in which the court sustained a statute of the State of Pennsylvania making it unlawful for any unnaturalized foreign-born resident to kill any wild bird or animal except in defense of person or property. The court said: "But we start with the general consideration that a state may classify with reference to the evil to be prevented, and that if the class discriminated against is or reasonably might be considered to define those from whom the evil mainly is to be feared, it properly may be picked out. A lack of abstract symmetry does not matter. The question is a practical one, dependent upon experience. The demand for symmetry ignores the specific difference that experience is supposed to have shown to mark the class. It is not enough to invalidate the law that others may do the same thing and go unpunished, if, as a matter of fact, it is found that the danger is characteristic of the class named. * * * The state 'may direct its law against what it deems the evil as it actually exists without covering the whole field of possible abuses.'"

In Ozan Lumber Company v. Union County National Bank, 207 U. S. 252, 52 L. ed. 195, (decided December 2, 1907) the Court sustained a statute of the State of Arkansas which provided: "Any vendor of any patented machine, implement, substance, or instrument of any kind or character whatsoever, when the said vendor of the same effects the sale of the same to any citizen in this State on a credit, and takes any character of negotiable instrument in payment of the same, the said negotiable instrument shall be executed on a printed form, and show upon its face that it was executed in consideration of a patented machine, implement, substance or instrument, as the case may be, and no person shall be considered an innocent holder of the same, though he may have given value for the same before maturity, and the maker thereof may make defense to the collection of the same in the hands of any holder of said negotiable instrument, and all such notes not showing on their face for what they were given shall be absolutely void." Section 4 of the act embraced an exemption as follows: "This act shall not apply to merchants and dealers who sell patented things in the usual course of business." In concluding that the exemption did not offend against the equal protection clause, the court said: "Its passage showed that the Legislature was of opinion that fraud and imposition were frequent in the sale of property of this nature, except in the cases mentioned in section 4, and that temptations to false representations in regard to the virtues and value of the article sold were also frequently yielded to. * * * It was doubtless thought that merchants and dealers, as mentioned in the statute, while dealing with the patented things in the manner stated, would not be so likely to make representations or to engage in a fraud to effect a sale, as those covered by the statute."

In Welch Co. v. New Hampshire, decided January 30, 1939, (Supreme Court L. ed. Advance Opinions, 1938-1939, Vol. 83— No. 8, page 363), (59 Supreme Court, 438), the court had under consideration a statute of the State of New Hampshire, section 8 of which provided: "It shall be unlawful for any driver to operate, or for the owner thereof to require or permit any driver to operate, any motor vehicle for the transportation of property for hire on the highways of this State when the driver has been continuously on duty for more than twelve hours, and after a driver has been continuously on duty for twelve hours it shall be unlawful for him or for the owner of the vehicle to permit him to operate any such motor vehicle on the highways of this State until he shall have had at least eight consecutive hours

off duty." The act required common carriers between points within the State to register their trucks with the Public Service Commission. Contract carriers included those, other than common carriers, who hauled for hire by motor vehicle on any road of the State. Exempted from the provisions of the act, as shown in sections 3 and 4 thereof, were those transporting products of their own manufacture, or labor and motor vehicles not principally engaged in the transportation of property for hire or operating exclusively in a city or town or within ten miles of its limits or beyond the 10-mile limit or not more than two trips in thirty days. In sustaining the statute the court used language as follows: "Sections 3, 4, and 8 are not repugnant to the equal protection clause. The State court found that the purpose of section 8 is 'to protect users of the highways of this State from the danger likely to result to them from the operation thereon of trucks under the control of drivers suffering from the effects of fatigue.' Appellant's contention is that the discrimination between drivers of motor carriers for hire subject to section 8 and those exempted by sections 3 and 4, has no fair or substantial relation to highway safety. It suggests, and we may assume, that the roads of New Hampshire are extensively used for transportation by trucks not regulated by sec. 8; that drivers of them are just as susceptible to fatigue from long hours of continuous operation as are those operating the trucks used by appellant and other common carriers for hire, and that the dangers attributable to fatigued drivers are the same in one class of service as in another. Appellant has failed to show that, in operations to which section 8 applies, continuous driving for more than 12 hours is not so much more prevalent than in those exempted (sections 3, 4) as to constitute a reasonable basis for the differentiation. We are of opinion that, for reasons given above, those stated by the State Supreme Court in this case and by this Court in Dixie Ohio Exp. Co. v. State Revenue Commission decided this day (306 U. S. 72, 59 S. Ct. 435) the classification in question does not conflict with the rule of equal protection."

In Dominion Hotel Company v. Arizona, 249 U. S. 265, 63 L. ed. 597, (decided March 24, 1919) it is shown that the plaintiff in error, defendant, was engaged in a hotel business and permitted a woman to work in the hotel for eight hours and that the "said eight hours of work was not then and there performed within a period of twelve hours." The statute upon which the information was predicated provided as follows:

"Provided further, that the said eight-hour period of work shall be performed within a period of twelve hours, the period of twelve hours during which such labor must be performed not to be applicable to railroad restaurants or eating houses, located upon railroad rights of way and operated by or under contract with any railroad company." The defendant set up that the exception in the statute made it void under the Fourteenth Amendment, as depriving him of the equal protection of the laws. In sustaining the statute the court said: "The equal protection of the laws does not mean that all occupations that are called by the same name must be treated in the same way. The power of the state 'may be determined by degrees of evil, or exercised in cases where detriment is specially experienced.'"

The instances of other cases are also instructive. We cite some of them without comment. See Silver v. Silver, 280 U. S. 117, 74 L ed. 221; Miller v. Wilson, 236 U. S. 373, 59 L. ed. 628; Crescent Cotton Oil Company v. Mississippi, 257 U. S. 129, 66 L. ed. 167; International Harvester Company of America v. State of Missouri, 234 U. S. 199, 58 L. ed. 1277.

We have referred to these cases and quoted from some of them at length for the reason that one of the points which was pressed by the Court in supporting its ruling in the Connolly Case was that the exemption from the operation of the statute of agricultural products and live stock while in the hands of the producer or raiser could not be of slight consequence as affecting the general public interested in domestic trade and entitled to be protected against combinations formed to control prices. We cite them with no view of expressing the opinion that they are especially opposite and contain the elements of the case at bar and a decision upon them. The considerations governing their holdings are not altogether the same as those deemed by us to be controlling in determining whether the statute under consideration is repugnant to the equal protection clause of the Fourteenth Amendment.

We deem it proper at this point to say that, in view of the decisions of the Courts of Civil Appeals and of the Supreme Court of this State, sustaining the validity of our anti-trust statutes—which decisions, as already observed, were rendered prior to the holding in Connolly's Case—it is our purpose to test the validity of the statute in the light of the decisions of the Supreme Court of the United States in which the equal protection clause of the Fourteenth Amendment has been construed and applied.

While the rules by which the reasonableness of a classification adopted by the Legislature in dealing with economic policy may not change, it can not be said that supervening economic conditions may not render a classification reasonable which, under the conditions prevailing at a remote time, would have been purely arbitrary. If a classification declared to be arbitrary and unreasonable more than thirty seven years ago should be taken to foreclose legislative adoption of the same classification in an effort to deal with economic problems affecting the prosperity and general welfare of the people of the State, then it may be said that the police power of the State is so circumscribed by the Fourteenth Amendment as that the Legislature is powerless to adequately deal with the problems resulting from changing economic conditions. It is in view of the supervening economic conditions since 1902 that we have not regarded the decision in the Connolly Case as determinative of the question in the case at bar. In reaching the conclusion that it should be again considered, we are cognizant of our duty to give effect to the decisions of the Supreme Court of the United States involving the application of the Fourteenth Amendment. We have been hesitant in reaching the conclusion that a discussion of the question should be renewed. But with due deference to the superior authority of the Supreme Court, we have felt that the importance of the question involved in this appeal to the people of the State makes it our imperative duty in deciding the case to give it fresh consideration. See West Coast Hotel Company v. Parrish, 300 U. S. 379, 81 L. ed. 703.

Returning to the case before us, it is manifest that the whole statute is one concerned with economic policy. It is a declaration of mala prohibita as to combinations to control the price of commodities by merchants, traders, manufacturers, not, however, as to combinations of farmers and stock raisers in dealing with their products in hand which they have produced or raised. As pointed out in the dissenting opinion of Mr. Justice McKenna in the Connolly Case, the class included in the statute is composed of merchants, traders, manufacturers, all engaged in commercial transactions, who generally are congregated in the cities and towns, while the excluded class is composed of farmers and stock raisers who are scattered over farms and ranches. It was largely due to the difference of these situations that Mr. Justice McKenna expressed the opinion that the classification adopted by the Illinois Legislature, in dealing with the economic policy of that State, was permissible under the equal protection clause of the Fourteenth

Amendment. Be that as it may, it is observed that the Fourteenth Amendment was not designed to interfere with the power of the State to deal with economic problems to the end that the general prosperity and well-being of the people might be promoted.

In Chicago, B. & Q. R. Co. v. Illinois, 200 U. S. 561, 50 L. ed. 597, it was held that the police power embraces regulations designed to promote the public convenience or the general prosperity, as well as regulations designed to promote the public health, the public morals, or the public safety. This principle was reiterated in Bacon v. Walker, 204 U. S. 311, 51 L. ed. 499. In Barbier v. Connolly, 113 U. S. 27, 28 L. ed. 923, the court used this language: "But neither the amendment, broad and comprehensive as it is, nor any other amendment was designed to interfere with the power of the State, sometimes termed its 'police power,' to prescribe regulations to promote the health, peace, morals, education and good order of the people, *and to legislate so as to increase the industries of the State, develop its resources and add to its wealth and prosperity.*" (Italics ours.)

In Chicago, B. & Q. Ry. v. McGuire, 219 U. S. 549, 55 L. ed. 328, in referring to the scope of the judicial inquiry in deciding the question of the power of the Legislature to prescribe regulations for the promotion of the general welfare, the Court said:

"The principle involved in these decisions is that where the legislative action is arbitrary and has no reasonable relation to a purpose which it is competent for government to effect, the Legislature transcends the limits of its power in interfering with the liberty of contract; but where there is reasonable relation to an object within the governmental authority, the exercise of the legislative discretion is not subject to judicial review. The scope of judicial inquiry in deciding the question of *power* is not to be confused with the scope of legislative considerations in dealing with the matter of *policy.* Whether the enactment is wise or unwise, whether it is based on sound economic theory, whether it is the best means to achieve the desired result, whether, in short, the legislative discretion within its prescribed limits should be exercised in a particular manner, are matters for the judgment of the Legislature, and the earnest conflict of serious opinion does not suffice to bring them within the range of judicial cognizance.

- "The principle was thus stated in McLean v. Arkansas, supra, (211 U. S. 539), pp. 547, 548: 'The Legislature, being familiar

with local conditions, is, primarily, the judge of the necessity of such enactments. The mere fact that a court may differ with the Legislature in its views of public policy, or that judges may hold views inconsistent with the propriety of the legislation in question, affords no ground for judicial interference, unless the act in question is unmistakably and palpably in excess of legislative power (cases cited). \* \* \* If there existed a condition of affairs concerning which the Legislature of the State, exercising its conceded right to enact laws for the protection of the health, safety, or welfare of the people, might pass the law, it must be sustained; if such action was arbitrary interference with the right to contract or carry on business, and having no just relation to the protection of the public within the scope of legislative power, the act must fail.' "

The question is whether the Legislature, in dealing with the economic policy with which the statute is concerned, has adopted a classification which can be said to have no reasonable relation to the promotion of the general welfare. The equal protection clause of the Fourteenth Amendment does not preclude the states from resorting to classifications for the purpose of legislation. Colgate v. Harvey, 296 U. S. 404, 80 L. ed. 299. But the classification must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike. In selecting some classes and leaving out others the Legislature, while it keeps within this principle of classification, is allowed wide discretion. Big Vein Coal Company v. Read, 229 U. S. 31, 57 L. ed 1053. Before a court can interfere with the exercise of the judgment of the Legislature in making a reasonable classification it must be able to say "that there is no fair reason for the law that would not require its extension to others whom it leaves untouched." Missouri, K. & T. R. Co. v. May, 194 U. S. 267, 48 L. ed. 971; Williams v. Arkansas, 217 U. S. 79, 54 L. ed. 673; Watson v. Maryland, 218 U. S. 173, 54 L. ed. 987. In Lindsley v. Natural Carbonic Gas Co., 220 U. S. 61, 55 L. ed. 369, the rules by which a contention that a classification offends against the equal protection clause must be tested are summarized as follows:

"1. The equal-protection clause of the Fourteenth Amendment does not take from the state the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis, and therefore is

purely arbitrary. 2. A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety, or because in practice it results in some inequality. 3. When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed. 4. One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary. Bachtel v. Wilson, 204 U. S. 36, 41, 51 L. ed. 357, 359, 27 Sup. Ct. Rep. 243; Louisville & N. R. Co. v. Melton, 218 U. S. 36, 54 L. ed. 921, 30 Sup. Ct. Rep. 676; Ozan Lumber Co. v. Union County Nat. Bank, 207 U. S. 251, 256, 52 L. ed. 195, 197; 28 Sup. Ct. Rep. 89; Munn v. Illinois, 94 U. S. 113, 132, 24 L. ed. 77, 86; Henderson Bridge Co. v. Henderson, 173 U. S. 592, 615, 43 L. ed. 823, 831, 19 Sup. Ct. Rep. 553."

These rules have, in varying language, been applied in numerous decisions of the Supreme Court of the United States in construing legislative enactments against the contention that they violated the equal protection clause. We advert to some of the cases. In American Sugar Refining Co. v. Louisiana, 179 U. S. 89, 45 L. ed. 102, the Court had under consideration a statute of the State of Louisiana imposing a tax on the business of refining sugar and molasses, based on the gross annual receipts of persons and corporations engaged in that business. The statute provided that it should not apply to planters and farmers, grinding and refining their own sugar and molasses, or to planters who granulated sugar for other planters during the rolling season. It was held that the exemption was valid, and that the act did not deny to persons and corporations engaged in a general refining business the equal protection of the laws.

In Aero Mayflower Transit Co. v. Georgia Public Service Commission, 295 U. S. 285, 79 L. ed. 1439, it is shown that a statute of the State of Georgia prescribed a system of regulation of private carriers for hire. Every private carrier operating a motor vehicle in the business of transporting persons or property for hire had to obtain from the Public Service Commission a certificate of public convenience or necessity; had to give a bond for protection against damage caused by negligence; had to pay for the service a fee of thirty five dollars; and at the same time and annually thereafter had to pay a registration and license fee for every vehicle so

operated. One of the exemptions in the act was that it did not apply to motor vehicles engaged exclusively in the transportation of agricultural or dairy products between farms, markets, gins, warehouse, or mill, where the weight of the motor vehicle did not exceed ten thousand pounds and whether such vehicle was owned by the owner or producer of such agricultural or dairy products or not, so long as the title remained in the producer. The question before the court was whether the appellant, who was a private carrier for hire engaged in the transportation of household and office furniture between points in Georgia and other states, was denied the equal protection of the laws because of the requirement of the act that persons in his class should pay an annual fee of thirty five dollars in order to obtain a license, whereas carriers for hire of agricultural or dairy products were exempted from the requirements. The classification was sustained. Among other things, the Court said: "We think a classification thus designed to ameliorate the lot of the producers of farm and dairy products is not an arbitrary preference within the meaning and the condemnation of the Fourteenth Amendment. The plight of the Georgia farmer has been pictured by the state court in words already quoted. To free him of fresh burdens might seem to a wise statecraft to be a means whereby to foster agriculture and promote the common good."

Bearing in mind that the statute is concerned with economic policy, the only question is whether we can say in our judicial knowledge that the Legislature could not have had any reasonable ground for believing that there were public considerations for the distinction made by the statute. When we look to the decisions of the state courts and the Supreme Court of the United States in which co-operative marketing statutes have been reviewed we find that there has been widespread legislative approval of the co-operative plan for protecting scattered producers and advancing the public interest.

The necessity for the enactment of legislation designed to stabilize the prices of agricultural products and thereby promote the public interest grew out of intolerable economic conditions of which judicial notice has been taken by the courts of various States of the Union. The plight of the American farmer has been pictured by the Court of Appeals of Kentucky in words as follows: "We take judicial knowledge of the history of the country and of current events, and from that source we know that conditions at the time of the enactment of the Bingham Act were such that the agricultural producer was

at the mercy of speculators and others who fixed the price of the selling producer and the purchasing price of the final consumer through combinations and other arrangements, whether valid or invalid, and that by reason thereof the former obtained a grossly inadequate price for his products. So much so was that the case that the intermediate handler between the producer and the final consumer injuriously operated upon both classes and fattened and flourished at their expense. It was and is also a well known fact that without the agricultural producer, society could not exist, and the oppression brought about in the manner indicated was driving him from his farm, thereby creating a condition fully justifying an exception in his case from any provision of the common law, and likewise justifying legislative action in the exercise of its police power." See Liberty Warehouse v. Burley Tob. C. Co-Op. Ass'n., 271 S. W. 695.

The enactment of the co-operative marketing act of this State (Chap. 8, Tit. 93, Articles 5737 to 5764, R. C. S. 1925) manifests an effort to aid the agricultural producers of the State to co-operate to the end that prices of their products might be stabilized, that waste might be eliminated, and that general prosperity might be promoted. In Lennox v. Texas Cotton Co-Operative Association, 55 S. W. (2d) 543, the Supreme Court of this State, in referring to co-operative marketing statutes, said: "The almost unanimous demand for the enactment of co-operative marketing association laws and the current events with respect to the urge for the passage of legislation to promote prosperity in agricultural pursuits is well known to the courts. Nearly every state in the Union enacted co-operative marketing statutes substantially like the one under review. To the same purpose Congress enacted the Clayton Act. October 15, 1914, chap. 323, 38 Stat. at L. 730; the Capper-Volstead Act, February 18, 1922, chap. 57, 42 Stat. at L. 388, U. S. C., title 7, secs. 291, 292 (7 USCA secs. 291, 292) ; and the Co-Operative Marketing Act of July 2, 1926, chap. 725, 44 Stat. at L. 802, U. S. C. title 7, sec. 414-1 et seq. (Mason's), 7 USCA secs. 451-457. These marketing acts have been given a liberal construction by the courts in order to accomplish the purposes for which they were enacted. See Liberty Warehouse Co. v. Burley T. G. Co-Op. Ass'n, 276 U. S. 71, 48 S. Ct. 291, 72 L. ed. 473, and the cases cited and referred to in the footnotes."

In Liberty Warehouse Co. v. Burley T. G. Co-op M. Ass'n, 276 U. S. 71, 72 L. ed. 473, the Supreme Court of the United States,

after referring to decisions of the various state courts in which the necessity for co-operative action by agricultural producers was recognized as being essential to the general prosperity of the Nation, used this language:

"It is stated without contradiction that co-operative marketing statutes substantially like the one under review have been enacted by forty-two states. * * * These statutes reveal widespread legislative approval of the plan for protecting scattered producers and advancing the public interest. Although frequently challenged, we do not find that any court has condemned an essential feature of the plan with the single exception of the Supreme Court of Minnesota in the above cited case."

In the case last quoted from the Supreme Court of the United States sustained the validity of the co-operative marketing statute of Kentucky and held that the state had the right to treat marketing contracts between the association and is members as of a separate class. The court said:

"The opinion generally accepted — and upon reasonable grounds, we think—is that the co-operative marketing statutes promote the common interest. The provisions for protecting the fundamental contracts against interference by outsiders are essential to the plan. This court has recognized as permissible some discrimination intended to encourage agriculture. American Sugar Ref. Co. v. Louisiana, 179 U. S. 89, 45 L. ed. 102, 105, 21 Sup. Ct. Rep. 43; Cox v. Texas, 202 U. S. 446, 50 L. ed. 1099, 26 Sup. Ct. Rep. 671. And in many cases it has affirmed the general power of the states so to legislate as to meet a definitely threatened evil. International Harvester Co. v. Missouri, 234 U. S. 199, 58 L. ed. 1276, 52 L. R. A. (N. S.) 525, 34 Sup. Ct. Rep. 859; Jones v. Union Guano Co. 264 U. S. 171, 68 L. ed. 623, 44 Sup. Ct. Rep. 280. Viewing all the circumstances, it is impossible for us to say that the Legislature of Kentucky could not treat marketing contracts between the association and its members as of a separate class, provide against probable interference therewith, and to that extent limit the sometime action of warehousemen."

Presumably the Legislature was moved by economic considerations in excepting agricultural products and livestock from the provisions of the statute. Indeed, the economic conditions to which reference has been made would seem to fully justify the conclusion that there was reasonable ground for believing that there were public considerations for making the exception. The Legislature, in making the classification,

was entitled to consider prevailing economic conditions and the differences between the classes in their relation to the ultimate object of the statute, which was the promotion of the general prosperity. We think that in view of the prevailing economic conditions at the time of the enactment of the statute it cannot be said that the distinction made is unreasonable.

In concluding, we express the view that the dissenting opinion of Mr. Justice McKenna in the Connolly Case, when viewed in the light of present economic conditions, is a complete answer to the contention of the appellant that the statute is repugnant to the equal protection clause of the Fourteenth Amendment. Among other things, he said:

"What was the purpose of the Illinois statute, and what were the relations of its classes to that purpose? The statute was the expression of the purpose of the State to suppress combinations to control the prices of commodities, not, however, in the hands of the producers, but in the hands of traders, persons, or corporations. Shall we say that such suppression must be universal or not at all? How can we? What knowledge have we of the condition in Illinois which invoked the legislation, or in what form and extent the evil of combinations to control prices appeared in that State? Indeed, whether such combinations are evils or blessings, or to what extent either, is not a judicial inquiry. If we can assume them to be evil because the statute does so, can we go beyond the statute and determine for ourselves the local conditions and condemn the legislation dependent thereon? But are there not, between the classes which the statute makes, distinctions which the Legislature had a right to consider? Of whom are the classes composed? The excluded class is composed of farmers and stockraisers while holding the products or livestock produced or raised by them. The included class is composed of merchants, traders, manufacturers, all engaged in commercial transactions. That is, one class is composed of persons who are scattered on farms; the other class is composed of persons congregated in cities and towns, not only of natural persons, but of corporate organizations. In the difference of these situations, and in other differences which will occur to any reflection, might not the Legislature see difference in opportunities and powers between the classes in regard to the prohibited acts? That differences exist cannot be denied. To describe and contrast them might be invidious. To consider their effect would take us from legal problems to economic ones, and this demonstrates

to my mind how essentially any judgment or action based upon those differences is legislative and cannot be reviewed by the judiciary."

The judgment is affirmed.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

### ON MOTION FOR REHEARING.

GRAVES, Judge.

The relator has filed a vigorous motion, evidencing dissatisfaction not only with the reasoning of the original opinion herein but also with the conclusion to which that reasoning inevitably led this Court. The burden of his complaint seems directed at the phrase contained in the original opinion wherein it is said: "While the rules by which the reasonableness of a classification adopted by the Legislature in dealing with economic policy may not change, it can not be said that supervening economic conditions may not render a classification reasonable which, under the conditions prevailing at a remote time, would have been purely arbitrary."

Although the law may be said to be changeless, nevertheless that which primarily evoked its enactment may have long since either changed or have been forgotten. The primary reason for the enactment of such law may have passed, but changing conditions, customs or environments might have caused its retention to become advisable, and it would still fulfill a duty and function to society. If so the usefulness of the law would surely continue, and would attach itself to the changed economic condition. An apt illustration might be that our penal statute against the carrying of arms exempted from its operation a person traveling; and such an exemption had been construed to mean, among other things, a person who was absent from home a day's journey, at such time of possibly thirty miles, and his return therefrom on the succeeding day. Changing economic conditions, however, at this day and time have supervened, and thirty miles is now but an hour's journey, and one taking such a journey would hardly be termed a traveler under such an exemption. By such phrase we could only mean that a classification being permissible, such must be reasonable and not palpably arbitrary, and under the exhaustive original opinion herein we think the reasonableness

of this classification has been shown. Principles never change; it is only the application of such principles to the facts and conditions that authorize a change. That economic conditions govern largely in such an application of this anti-trust statute can not be denied. It concerns itself alone with such conditions. In the Connolly Case, decided March 10, 1902, the United States Supreme Court decided that an exemption of farmers and stock raisers from the provisions of the Illinois anti-trust law, while their products remained in their own hands, was an unreasonable and arbitrary classification, thus rendering such law obnoxious to the Fourteenth Amendment to the U. S. Constitution. We therefore see that the vice found in such exemption lay only in what that court considered its unreasonableness. It is our present thought that the conditions then present have changed; that supervening economic conditions have enlarged upon the different position of one who has produced commodities absolutely necessary for the continuance,—not convenience,—of human life and its well-being, as contradistinguished from one who merely takes these necessities after their production and juggles with them for the purpose of taking a profit therefrom. Under such supervening economic conditions we still adhere to the herein expressed conclusions in the original opinion, that a reviewing court will look favorably upon the reasonableness of the classification that exempts farmers and stock raisers from the provisions of our anti-trust laws so long as their products remain in their own hands.

The original opinion herein was written after many months of careful research through many cases on the subject written by the major courts of the Union, as well as the United States Supreme Court, and we adhere to the views expressed therein.

The motion is overruled.