

# THE ATTORNEY GENERAL
# OF TEXAS

AUSTIN 11, TEXAS

PRICE DANIEL
ATTORNEY GENERAL

Honorable L. R. Pearson, Chairman
Oil, Gas & Mining Committee
House of Representatives
Austin, Texas

Dear Sir:                          Opinion No. V-97

Re: Effect which House Bill 67,
allowing agreements for co-
operative exploration, de-
velopment, and operation of
oil and gas properties, and
marketing of gas, would have
on the Texas antitrust laws.

We have your letter of March 5, 1947, a portion of which
reads:

"Would the passage of the proposed legislation as
outlined in House Bill 67 endanger the validity of the
antitrust laws of this State, and what, in your opinion,
would be the effect of this legislation upon our anti-
trust statutes from the standpoint of both validity
and enforceability?"

The portion of H. B. 67 touching on the antitrust laws
declares it to be lawful for two or more "persons" which would
include partnerships and corporations, owning, claiming, or con-
trolling production, royalties, leases, or other interest, in the
same oil or gas field, to enter into and perform agreements for
the purpose of bringing about cooperative explorations, devel-
opment, and operation of any part or all of such field. Among
other things, such agreements may provide for joint exploration;
location and spacing of wells; for cycling, re-cycling, repressur-
ing, and pressure maintenance; for the storage of gas; for the
marketing of gas, but not the marketing of oil; for the joint ex-
traction of casinghead gas and the return of the gas to the earth.

The bill allows agreements "for the equitable distribu-
tion on an agreed basis of oil and gas produced therefrom." It
provides that no royalty shall be required to be paid on gas re-

turned to the earth. It provides for the indefinite extensions (holding) of leases covering any part of the lands committed thereto so long as oil or gas is produced in any part of the field covered by the agreement. In other words, if the agreement covered a whole field, every privately owned lease in the field could be held indefinitely by production from one well therein, wherever located.

The agreements are to become operative when approved by the Railroad Commission, after notice and hearing, after a finding that they will prevent waste, or "tend" to promote conservation, and will protect correlative rights.

Section 5 provides that neither the making nor performance of such agreements shall be unlawful or violate the antitrust laws of the State.

The portions of the antitrust laws most closely affected are Art. 7426, R. C. S. 1925, and Art. 1632 P. C., both of which define a "trust" as a combination by two or more persons or corporations:

> "1. To create, or which may tend to create, or carry out restrictions in trade or commerce * * * * *

> "2. To fix, maintain, increase or reduce the price * * * * *

> "3. To prevent or lessen competition * * * * *

> "4. To fix or maintain any standard or figure whereby the price of any article * * * * * or the preparation of any product for market or transportation, shall be in any manner affected, controlled or established.

> "5. To make * * * or carry out a contract * * * to preclude a free and unrestricted competition among themselves * * * or by which they shall agree to pool, combine or unite any interest they may have in connection with the sale or purchase of any article or commodity * * * *

"6. To regulate, fix or limit the output of any
article or commodity which may be manufactur-
ed, mined, produced or sold."

It is obvious from a reading of the above statutes that H.B.
67 is inconsistent with all of the above quoted sections of the anti-
trust laws in the following particulars:

1. The above quoted antitrust laws (Sec. 1, 3, 5) prohibit
agreements which restrict trade, lessen or preclude free and unre-
stricted competition. H. B. 67 makes such agreements lawful when
they are made by persons "owning, claiming, or controlling pro-
duction, leases", etc. in the "same oil field, gas field, or oil and
gas field." The proposed Bill not only lessens competition but
legalizes combined production agreements which will preclude
competition between parties to the agreements.

2. The antitrust laws (Sec. 5) prohibit pooling, combin-
ing, or uniting of interests in connection with sale or purchase of
any commodity. H. B. 67 (Sec. 1d) expressly allows agreements
among oil companies and others in connection with the marketing
of gas from a field.

3. The antitrust laws (Sec. 2 and 4) prohibit agreements
which fix or maintain prices or standards whereby prices or cost
of production of any product are affected, controlled or establish-
ed. H. B. 67 permits such agreements as to cost of production
of oil and gas and as to the price for which gas may be marketed.

4. The antitrust laws (Sec. 6) prohibit agreements
which fix or limit the output of any article or commodity which
may be mined, produced or sold. Under H. B. 67 such agreements
would be legal as to production within the unitized area.

Even such a desirable program as the conservation of oil
and gas bears scrutiny. No production at all, or small production,
would certainly conserve the resources. But it would also lend
itself to monopoly and price fixing, and other ends which the anti-
trust laws were specifically enacted to prevent.

Since H. B. 67 is inconsistent with the antitrust laws,
and since Section 5 thereof states that the making of such agree-
ments shall not be declared unlawful, the subject matter of this
bill is made an outright exception to the antitrust laws.

There is no direct authority of the Courts on what effect this particular enactment would have on the antitrust laws. There is now a Texas Statute, Art. 6008, Sec. 21, which permits voluntary unitization of gas fields, including the marketing of gas, with the approval of the Attorney General. This law has not been tested in the courts on the antitrust feature. H. B. 67 expressly provides for the repeal of Section 21 of Article 6008 in its entirety and rewrites such law omitting the now-required approval of the Attorney General. (Sec. 21, Ch. 120, Acts 44th Leg. R. S. p. 318).

Arkansas and Oklahoma have laws similar to H. B. 67 (Okla. Laws, 1945, pp. 162-170; Title 52, Sec. 286, 1 to 17; Arkansas Laws, 1939, p. 219, Act 105, Sec. 15.) Each of these statutes has a provision that such agreements shall not be construed to violate the antitrust statutes. These laws have not been tested on their antitrust provisions.

"Monopolies are contrary to the genius of a free government, and shall never be allowed." Tex. Constitution, Art. I, Section 26. Whether the subject bill will create monopolies cannot be determined at this time. If it creates monopolies, the statute will be unconstitutional, and agreements made thereunder will be void.

The danger to the antitrust laws about which you show concern is doubtless "the equal protection of the laws" clauses of the Texas and Federal Constitutions. If exceptions are made to the antitrust laws to the extent that one group is authorized to do acts for which another could be fined and imprisoned, the antitrust laws would be held void, because such citizens would not be receiving "equal protection of the laws."

When then, and under what circumstances may the Legislature make valid exceptions to the antitrust statutes? Articles 1643 and 1644 of the Penal Code make certain exemptions for labor and trade unions; and Article 1642 of the Penal Code makes an exception in favor of agricultural products or live stock while in the hands of producers or raisers. Art. 5762 R.C.S. exempts marketing associations from such act.

The Texas Courts and the United States Supreme Court have upheld the Texas antitrust laws notwithstanding the above exceptions. The Courts have held that the above exceptions were

reasonable, and were warranted by economic conditions. The general rule is stated in 36 Am. Jur. 579:

> "The constitutional prohibition against dis-
> criminatory class legislation requires that an anti-
> trust act apply alike to all persons and corporations
> of the same class. The state is not, however, pre-
> cluded from classifying persons and things for the
> purpose of legislation, provided the classification is
> reasonable."

In Hollingsworth v. Texas Hay Association, (1923), 246 S.W. 1068 (writ refused), the Court had before it an agreement made under the Cooperative Marketing Act, which provides:

> "No association organized hereunder shall be
> deemed to be a combination in restraint of trade or
> an illegal monoply; or an attempt to lessen competi-
> tion or fix prices arbitrarily; nor shall the market-
> ing contracts or agreements between the association
> and its members nor any agreements authorized in
> this act be considered illegal or in restraint of
> trade."

The Court tersely disposed of the matter by saying, "We know of no constitutional reason why the public policy of the state may not be so declared."

It was decided in State v. Standard Oil Co., 130 Tex. 313, 107 S.W. (2d) 550, that the exemption from the antitrust laws of agreements made by persons engaged in agricultural pursuits did not render invalid the antitrust laws under the "equal protection" clauses of the State and Federal Constitutions. The majority view, (Justices Sharp and Critz), stated that "The Legislature has the right, within the exercise of its power, to make certain classifi-cations of subjects and persons; but such classifications must not be arbitrary or unreasonable." Chief Justice Cureton, expressing the minority view of the then three-judge Court, stated that to exempt cooperative marketing associations from the antitrust laws rendered such laws null and void because of the provision of Sec. 3, Art. I, of the Texas Constitution which declares that "All free men, when they form a social compact, have equal rights. * * *"

The latest Texas case involving exemptions from the anti-

trust laws is Ex parte Tigner, 139 Tex. Crim. 452, 132 S.W. (2d)
885. Tigner was charged with conspiring to fix the retail price of
beer. His defense was that since the antitrust laws exclude those
dealing in agricultural products and livestock while in the hands of
the producer or raiser, the Texas antitrust laws were void. The
Court of Criminal Appeals refused to follow such contention, and up-
held the antitrust laws. After an exhaustive opinion, the Court con-
cluded:

> "The question is whether the legislature, in deal-
> ing with the economic policy with which the statute
> is concerned, has adopted a classification which can
> be said to have no reasonable relation to the promotion
> of the general welfare. The equal protection clause of
> the Fourteenth Amendment does not preclude the states
> from resorting to classifications for the purpose of
> legislation. * * * But the classification must be rea-
> sonable, not arbitrary, and must rest upon some ground
> of difference having a fair and substantial relation to
> the object of the legislation, so that all persons simi-
> larly circumstanced shall be treated alike. In select-
> ing some classes, and leaving out others the legislature,
> while it keeps within this principle of classification, is
> allowed wide discretion. * * * Before a court can in-
> terfere with the exercise of the judgment of the legis-
> lature in making a reasonable classification it must
> be able to say 'that there is no fair reason for the law
> that would not require * * * its extension to others
> whom it leaves untouched.' "

The above holding was affirmed by the U. S. Supreme
Court in Tigner v. Texas (1940), 310 U. S. 141, 130 A. L. R.
1321. Throughout the opinion, holding the exception to be rea-
sonable and not arbitrary, Justice Frankfurter pointed out the
differences between agriculture and industry; that a different
concept of price and production policy existed for agriculture;
that farmers were widely scattered, modestly financed, and in-
ured to the habits of individualism; and that legislators may
well have thought that combinations of farmers presented no
threat to the community.

While the above distinctions are not considered to be
the only items to be considered in determining whether a classi-
fication is reasonable or arbitrary, the reasoning of the Tigner

case is not applicable to the oil industry. Such industry is highly organized, closely integrated, and of tremendous power and wealth. Further, an exception in its favor would not be like making a broad distinction between industry and agriculture, or industry and labor, but would be carving out a particular classification within industry inself. Would exemption to the oil industry give "equal protection of the laws" to other industries subject to prosecution if they make similar agreements? Is it fair and reasonable to require prosecution of fishermen, retail druggist, wholesale grocers, or persons engaged in the production of lumber or sulphur, while the oil people are exempt? These are matters the courts will look into in determining whether the exception is reasonable or arbitrary.

In considering the reasonableness of the exceptions to the antitrust laws made by H. B. 67, and also considering the constitutional questions of freedom of contract and due process, the courts will undoubtedly look to reasoning and holding of decisions which have upheld statutes and orders requiring compulsory pooling of oil and gas properties. Four of the states bordering Texas allow such compulsory pooling. The States are Louisiana (R.S. 1940, p. 610; Act 157, Sec. 9a); New Mexico (Laws 1935, Ch. 72, p. 137, Sec. 12; N. M. Stat. Anno. official ed. Sec. 69-213); Oklahoma (Laws 1945, p. 157, Sec. 4, amending Title 52 Sec. 87, Laws 1941; and Arkansas (Laws 1939, Act 105, Sec. 15, as amended by Act 86, 1941).

Without considering the effect on the antitrust laws, forced pooling has been upheld in these states. Patterson v. Stanolind O. & G. Co. (1939), 305 U. S. 376, affirming the Oklahoma Supreme Court, 77 P (2d) 83, noted with approval 16 Tex. L. Rev. 597, 37 Mich. L. Rev. 955 and 2 La. L. Rev. 191; Placid Oil Co. v. North Central Tex. Oil Co. (La. Sup. 1944), 19 So. (2d) 616; Hunter Co. v. McHugh, (La. Sup. 1942), 11 So. (2d) 495, noted 16 Tulane L. Rev. 477, (Upholding a compulsory unitization allowing only one gas well to each 320 acres); Croxton v. Oklahoma, (1939), 97 P.(2d) 11; Marrs v. City of Oxford, 32 F. (2d) 134 (CCA 8th 1929) cert. den. 280 U. S. 573. A three-judge Federal District Court upheld compulsory pooling under a city ordinance in the South Houston field. Tysco Oil Co. v. Railroad Commission, (1935) 12 F. Supp. 195.

The text writers are almost uniformly of the view that pooling of natural resources is desirable from the standpoint of

conservation and the protection of correlative rights. 1 Summers, Oil and Gas 275 Sec.104; Walker, "The Problems of the Small Tract Under Spacing Regulations," 17 Tex. L.Rev. (Bar No.) 157, 169; Ely, "The Conservation of Oil," 51 Harv.L.Rev. 1209,1235; German, "Compulsory Unit Operations of Oil Pools," 17 A.B.A. Journal 393; and Moses, "Some Legal and Economical Aspects of Unit Operations," 21 Tex. L. Rev. 748, 765. Only the last mentioned article deals with the antitrust problem.

Under the above authorities, because of the peculiar nature of oil and gas as natural resources, we are of the opinion that an exception to the antitrust laws allowing voluntary pooling by both lessors and lessees, based solely on the necessity of same for conservation of natural resources, the prevention of waste,and the protection of correlative rights, would probably be upheld by the Courts as valid and reasonable; and as such, would not endanger the validity of the antitrust laws. It is understood that such was the only intent of the author of this Bill. From a discussion of the Bill with the author we learn that its primary purpose is to recognize as lawful any pooling agreements necessary for operators (1) to have a unit large enough to meet Railroad Commission spacing rules, (2) to establish units necessary to effect secondary recoveries through repressure methods, water flooding, and pressure maintenance; and (3) to establish a co-operative gas re-cycling system for a field in order to strip the wet gas and other hydrocarbons, and return the dry gas to the sands by common input wells.

If this Bill were limited to the above operations, and agreements thereunder were made lawful only when reasonably necessary for prevention of waste, conservation of oil and gas, and protection of correlative rights, (such necessity to be determined by the Railroad Commission upon application, notice and hearing) then it is our opinion that the Bill would not constitute an unreasonable or arbitrary exception to the antitrust laws and would not invalidate or endanger future enforcement thereof. (In this connection it should be pointed out that both the Oklahoma and Arkansas statutes allow or require such pooling units only when reasonably "necessary" to carry on conservation measures, prevent waste, and afford greater ultimate recovery.)

However, as now written, H. B. 67 is much broader than the above reasonable exception. It does not limit the making of such agreements to instances when same are found necessary by

the Railroad Commission. Concerning the making of the agreements, H. B. 67 simply provides:

"* * * Therefore, it shall be lawful for two or more persons owning, claiming, or controlling production, leases, royalties, or other interests in separate properties in the same oil field, gas field, or oil and gas field, when it appears from geologic or other data that such properties are underlaid by one or more common accumulations of oil or gas, or both, to enter into and perform agreements for the purpose of bringing about cooperative explorations, development, and operations of all or any part or parts of such field. * * *"

The provision for Railroad Commission approval before the agreement becomes operative requires a mere finding that the agreement will prevent waste or "tend" to promote conservation. It does not require a finding that such unitization is reasonably necessary for conservation.

In other words, to be a reasonable exception from the anti-trust laws so as not to invalidate them, in this instance the exception should be necessary in the public interest, and should not include or permit such agreements merely for the convenience of or monetary savings to the oil and gas producers. It is believed that, as written, some of the provisions of H. B. 67 could and would be used primarily for the convenience and profit of lessees without any necessary relation to oil and gas conservation.

For instance, H. B. 67 would allow pooling agreements for exploration of a prospective field even before a test well is drilled. Surely it would save money and restrict competition to allow oil operators to conduct a joint geophysical exploration and to drill the first test well as a joint project, but can it be said that same is reasonably necessary to promote conservation when, at the time, oil or gas has not even been discovered?

Another instance: As written, H. B. 67 would permit the convenience of oil and gas producers to be served by agreeing to limit production and to hold an entire field under lease through production from only one well (or a limited number of wells), with conservation of resources as merely an incidental or secondary consideration.

For the reasons stated, it is our opinion that the Bill as

now written provides unreasonable exceptions which would seriously endanger the validity of the antitrust laws of Texas when applied to other persons or corporations.

With regard to the enforceability of the antitrust laws, it is unquestionable that this statute will make the task of this office infinitely more difficult. For example, if the oil industry were charged with fixing the price of gas throughout the State, the condemning proof would be extremely difficult where such companies may legally combine within individual fields for the purpose of marketing and fixing the price of gas.

In that connection, your attention is directed to the case of Shamrock Oil & Gas Corp. v. Coffee, 140 F. (2d) 409, (CCA 5th 1944) cert. den. 323 U. S. 737. The lease contract in that case provided that the lessor should receive the "market price at the well of 1/8 of the gas." There was but one purchaser in the field who purchased the gas; and it bought from all wells at a price between 1/2 and 4/5 a cent per thousand feet, thus establishing "a market price in the field." Because many products, butane, propane, etc. were made from such gas, the proof showed that the gas was reasonably worth from 1 to 1.4 cents. The Court held that the lessor was limited under his contract to the lower market price offered and paid by the pipe line company, "in the absence of collusion, combination, conspiracy, or combination in restraint of trade among the buyers fixing the market price." H. B. 67 says agreements as to marketing of gas by oil companies and others within the field shall not be declared to be in violation of the antitrust laws. Here again the difficulty of prosecuting persons or companies who combined to fix the price paid becomes obvious.

If the oil and gas industry is exempt, it would be understandably harder to get a conviction against another industry which is prosecuted for making an agreement which the oil and gas companies can legally make. Courts and juries would understandably question the prosecution of merchants where farmers, laborers, and now the oil industry are exempt.

Before closing, it must be mentioned that H. B. 67 expressly repeals Art. 5368b (Acts 49th Leg., p. 507, c. 309), authorizing the Commissioner of the General Land Office to enter into pooling agreements and fixing a minimum royalty. H. B. 67 rewrites this statute omitting the provisions for the minimum royalty to the State.

H. B. 67 also repeals Art. 4192a (Acts 49th Leg., p. 117, c. 80) allowing guardians to enter into pooling agreements. The proposed legislation rewrites this statute and expands it to include administrators, executors and other fiduciaries administering estates.

## SUMMARY

H. B. 67 authorizing unitization agreements for cooperative explorations, development, and operation of oil and gas properties, and the marketing of gas, without the requirement that the same be necessary for the prevention of waste and conservation of natural resources, if enacted as written, would constitute a serious threat to the antitrust laws of this State. Its enactment as written would make more difficult the enforcement of the antitrust laws.

Yours very truly,

ATTORNEY GENERAL OF TEXAS

By      *Joe R. Greenhill*

Joe R. Greenhill
Assistant

JRG/lh


The foregoing opinion was considered and approved in a conference composed of the Attorney General, First Assistant Attorney General Fagan Dickson, and Assistant Attorneys General Ocie Speer, James D. Smullen, Ned McDaniel, Elton Hyder, Jr. and J. A. Amis, Jr.

*Price Daniel*

Price Daniel
Chairman of the Conference