J. W. NICHOLS COMPANY, Appellant,

v.

John C. WHITE, Commissioner of Agriculture, Appellee.

No. 10666.

Court of Civil Appeals of Texas.

Austin.

June 10, 1959.

Bracewell, Reynolds & Patterson, Harold R. DeMoss, Jr., Houston, for appellant.

Will Wilson, Atty. Gen., Tom I. McFarling, Henry G. Braswell, Asst. Attys. Gen., for appellee.

HUGHES, Justice. ·

J. W. Nichols Company, a Texas Corporation, filed this suit for a declaratory judgment under Art. 2524–1, Vernon's Ann. Civ.St., for the purpose of having determined the constitutionality of Art. 165–8, V.A.C.S., Acts 1957, 55th Leg., ch. 133, p. 288, known as the "Texas Egg Law." This Act provided that the Commissioner of Agriculture of the State of Texas should administer and enforce the Act and

it was stipulated that John C. White, present Commissioner, was enforcing the Act as required by it. Commissioner White was the only party sued.

The pleadings and the evidence show that the J. W. Nichols Company is in the business of buying, grading, packaging and selling chicken eggs, both to wholesalers, dealers, to retail outlets, and directly to consumers through its own outlets.

Presented to the Trial Court for its determination were these questions:

"1. Is Article 165–8 unconstitutional in its entirety?

"2. Are either, or all, of Sections 5, 6, 7, Subsections (b) and (e) of Section 9 and Section 17 unconstitutional in whole or in part?

"3. In view of the restrictions and regulations imposed by this Article, may Plaintiff continue to use its brand name of 'J. W. Nichols—A-plus Eggs?'"

Judgment was rendered declaring the Act constitutional in its entirety and in its several parts and denying appellant any relief.

We quote below so much of the Act as is pertinent to the questions and arguments presented:

"Section 1. This Act is named and may be cited as the Texas Egg Law and relates only to chicken eggs sold in the State of Texas. The law shall be administered and enforced by the Commissioner of Agriculture, hereinafter referred to as the Commissioner.

"Sec. 2. As used in the Act, the word 'person' means an individual, firm, corporation, cooperative, or any other type of business entity.

"Sec. 3. (a) The standards of quality as determined by candling and conditions of shell, the grades and the standards of size as determined by weighing shall be the same as the standards and grades promulgated by the United States Department of Agriculture for shell eggs.

"(b) All eggs which are offered for sale to consumers shall be graded according to consumer grades and weight classes, except as otherwise provided in Sections 4 and 11.

"(c) All eggs which are offered for sale at wholesale shall be graded according to wholesale grades and weight classes, except as otherwise provided in Sections 4 and 11.

"Sec. 4. Eggs offered for sale but not graded or weighed shall comply with the provisions of Section 9 with the word 'Ungraded' used instead of quality and size.

"Sec. 5. It shall be unlawful to sell in bulk or in containers or subcontainers eggs that are or contain inedible eggs and which are not denatured, provided that not to exceed five per cent (5%) by count of inedibles shall be permitted when eggs are going to a dealer for candling and grading or to a breaking plant for breaking purposes. Eggs of the following descriptions are classed as inedible: Leakers, black rots, white rots, mixed rots, addled eggs, incubated eggs, eggs showing blood rings, eggs containing embryo chicks (at or beyond the blood ring stage), and any eggs unfit for human consumption due to causes other than those listed in this section.

"Sec. 6. It shall be unlawful to sell or advertise shell eggs below the quality of Grade A as 'fresh,' 'yard,' 'selected,' 'hennery,' 'newlaid,' 'infertile,' 'cage,' or other words of similar import or to represent the same to be fresh; provided, however, that this section shall not apply to producers of eggs when selling only the production of their own flocks.

"Sec. 7. After being received from the producer, all shell eggs for human

consumption shall be properly handled to prevent undue deterioration.

"All eggs shall be handled under reasonably sanitary conditions. The Commissioner is authorized to promulgate rules and regulations prescribing standards of sanitation for the handling of eggs.

"Sec. 8. Unless the egg grading is under official United States Department of Agriculture supervision, it shall be unlawful to use the prefix 'U.S.' on grades and weight classes of shell eggs.

"Sec. 9. All containers in which eggs for human consumption are offered for sale to food purveyors or consumers must:

"(a) be labelled according to size and grade in distinctly legible bold face type not less than one-fourth (¼) inch in height;

"(b) not be deceptively labelled, advertised, or invoiced;

"(c) state the name of either the dealer, retailer, food purveyor, or agent by or for whom the eggs were graded and labelled;

"(d) not be advertised in a manner which indicated price without also indicating the full, correct and unabbreviated designation of size and grade of the eggs therein;

"(e) be labelled 'cold storage eggs' if the eggs offered for sale therein have been held under refrigeration for a period of thirty (30) days or more.[1]

"In the case of eggs offered for sale uncartoned, a sign showing the proper designation of size and grade must be clearly displayed attached to the container. This sign must be distinctly legible in letters at least one (1) inch high.

"Sec. 10. It shall be presumed from the fact of possession by any person engaged in the sale of eggs that such eggs are for sale for human consumption as food unless they have been denatured or labelled in accordance with their specific intended uses other than human consumption.

"Sec. 11. The producers of eggs when selling only the production of their own flocks shall be exempted from all provisions of this Act unless they claim some kind of grade, in which event they must conform to the requirements of the Act.

\*  \*  \*  \*  \*  \*

"Sec. 14. It shall be unlawful for any person to buy or sell eggs within this state for subsequent resale without first obtaining a license from the Commissioner, with the following exceptions:

"(a) Those who sell only eggs produced by their own flocks unless a grade is claimed;

\*  \*  \*  \*  \*  \*

"Sec. 17. (a) Every licensed dealer, wholesaler, and processor shall keep on file within this state for a period of two (2) years a true and complete record of all eggs purchased or sold. This record shall show the name and address of the person from whom eggs were purchased and to whom sold, and also the number of dozen or cases included in each transaction and the date thereof. Provided, that in situations where such person is also a retailer, and said eggs have been purchased by him from the producers thereof in less than case lots, no connection need be made between the record of such eggs purchased and the record of such eggs sold. The Commissioner may prescribe record forms and may require such additional information as may be necessary in

---

1. This section (e) has been repealed. See infra.

the administration of this Act. The records shall be open to inspection by the Commissioner or his duly authorized representative at all reasonable times.

"(b) Every licensed dealer, wholesaler, and processor shall deliver with each transaction, sale or delivery a signed invoice stating the date, quantity, grade and size of the eggs sold, and shall keep a copy of each invoice for the same period as stated in subdivision (a) of this section."

Violation of any provision of the Act is made a criminal offense.

The attack upon the constitutionality of the Act as a whole is based upon the contentions (a) that it constitutes an unreasonable regulation of appellant's lawful business and is not authorized under the police powers of the State and (b) that in exempting producers of eggs it denies appellant the equal protection of the law under appropriate provisions of our State and Federal Constitutions.

Appellant concedes that the State may prohibit the sale of inedible eggs. It denies that the State may require eggs to be graded according to standards of aesthetic values and that such grading be done at the seller's risk. Complaint is also made of the statutory requirement that eggs sold to consumers and not graded and labelled as required by Sec. 3(b) and Sec. 9 of the Act be labelled "ungraded" as required by Section 4.

Appellant states that in order to understand its contention that the Act requires eggs to be graded according to standards mostly aesthetic in nature it is necessary to discuss the process of grading eggs in compliance with U. S. Department of Agriculture Regulations which are incorporated in the Act by Sec. 3(a). We quote the discussion made by appellant:

"Eggs are graded on the basis of three factors, i. e. size, weight and quality. Size and weight, of course, are objective factors which can be fairly accurately determined. Quality, however, is essentially a subjective determination based on a consideration of such factors as the shape, texture, cleanliness, soundness and color of the shell and the size of the interior air space and the appearance of the yolk and white. While the eggs are still in their shells it is, of course, impossible to see directly the nature of the contents of the shell. The process by which the interior quality of an egg is judged is called 'candling'; individuals hold each egg in front of an apperture in a box containing a bright light; by manipulating the egg the contents of the shell can be set in motion and as they revolve the light passing through the egg will cause the yolk to cast a shadow on the shell. The position and degree of distinctness of this shadow are considered in judging the condition of the yolk and the consistency of the white. Imperfections in either the white or the yolk will likewise give off shadows under the candling light. In efficient commercial operations a single candler should candle an average of 7,200 eggs per day. The standards of quality for the various grades of eggs are set forth [below] [2] The essential differences between the various qualities of eggs, excluding imperfections, concern the firmness of the yellow and

2. "United States Standards, Grades, and Weight Classes for Shell Eggs. (Reprinted from the Federal Register of February 1 and 4, December 23, and 29, 1955; and July 13, 1956).
Effective July 13, 1956
United States Standards for Quality of Individual Shell Eggs
"§ 56,200 *Application.* (a) The United States standards for quality of individual shell eggs contained in this subpart are applicable only to eggs that are the product of the domesticated chicken hen and are in the shell. Such standards are with respect to individual eggs with clean or dirty unbroken shells, and checked or cracked shells.
"(b) Interior egg quality specifications for these standards are based on the apparent condition of the interior con-

the consistency of the white; when broken out of the shell the yolk in eggs of the highest quality will stand up firm on a flat surface and the white of the egg will adhere closely to the yolk. A particular grade of eggs is a lot composed of a certain

tents of the egg as it is twirled before the candling light. Any type or make of candling light may be used that will enable the particular grader to make consistently accurate determinations of the interior quality of shell eggs. It is desirable to break out an occasional egg and, by use of the USDA color chart 'Interior Quality of Eggs,' compare the broken-out and candled appearance, thereby aiding in correlating candled and broken-out appearance.

"§ 56,201 *AA Quality*. The shell must be clean, unbroken, and practically normal. The air cell must not exceed ⅛ inch in depth and be practically regular. The white must be clear and firm so that the yolk appears well centered and its outline only slightly defined when the egg is twirled before the candling light. The yolk must be free from apparent defects.

"§ 56,202 *A Quality*. The shell must be clean, unbroken, and practically normal. The air cell must not exceed ⅖ inch in depth and must be practically regular. The white must be clear and at least reasonably firm so that the yolk appears at least fairly well centered and its outline only fairly well defined when the egg is twirled before the candling light. The yolk must be practically free from apparent defects.

"§ 56,203 *B Quality*. The shell must be unbroken and may be slightly abnormal and may show slight stains but no

percentage of eggs of that quality, with tolerances allowed for eggs of lower quality to allow for oversights, minor errors and differences of opinion in the candling process. A summary of U.S. consumer grades for shell eggs is [shown below].[3] The information

adhering dirt, provided that they do not appreciably detract from the appearance of the egg. When the stain is localized, approximately ¹⁄₃₂ of the shell surface may be slightly stained, and when the slightly stained areas are scattered, approximately ¹⁄₁₆ of the shell surface may be slightly stained. The air cell must not exceed ⅜ inch in depth, may show unlimited movement, and may be free but not bubbly. The white must be clear and may be slightly weak so that the yolk may appear off-center, with its outline well defined when the egg is twirled before the candling light. The yolk may appear slightly flattened and may show other definite, but not serious, defects.

"§ 56,204 *C Quality*. The shell must be unbroken and may be abnormal and may have slight to moderate stained areas covering not more than ¼ of the shell surface, but no adhering dirt. Prominent stains are not permitted. The air cell may be over ⅜ inch in depth and be free or bubbly. The white may be weak or watery so that the yolk may appear off-center and its outline plainly visible when the egg is twirled before the candling light. The yolk may appear dark, enlarged, and flattened, and may show clearly visible germ development but no blood due to such development. It may show other serious defects that do not render the egg inedible. Small blood clots or spots may be present."

3. "Summary of U. S. Consumer Grades for Shell Eggs (Reprinted from the Federal Register of February 1 and 4, December 23 and 29, 1955; and July 13, 1956.

Effective July 13, 1956

| "U. S. Consumer Grade | At least 80% (lot overage) (1) must be— | Tolerance permitted (2) Percent Quality | |
|---|---|---|---|
| Grade AA.... | AA Quality | 15 to 20......... | A |
| | | Not over 5 (3)... | B, C, or Check |
| Grade A...... | A Quality or better | 15 to 20......... | B, |
| | | Not over 5 (3)... | C, or Check |
| Grade B...... | B Quality or better | 10 to 20......... | C |
| Grade C...... | C Quality or better | Not over 10 (3).. | |
| | | Not over 20 ..... | Dirty or Check |

contained in the foregoing discussion of the grading process and in items one and two in the appendix is substantiated by the U. S. Department of Agriculture Handbook No. 75, The Egg Grading Manual, October, 1955, as well as by the testimony presented in this case.

"From the foregoing it is apparent that the primary difference between an egg of A quality and an egg of C quality is its appearance when taken out of the shell; the former just looks better than the latter. There is no distinction between the two as to food value, taste or wholesomeness. An egg of A quality, as such, does not purport to have more minerals or vitamins than an egg of B quality. There is no representation that because an egg is of A quality it has more protein than an egg of C quality nor is there any certification that an egg of A quality has a lower bacteria count or is more free of germs than an egg of B quality.

"And thus, we return to Appellant's original inquiry; can the State validly force it to sell its eggs only according to the qualities established by this Act or as 'ungraded'? Appellant respectfully submits it cannot. Such requirement does not in any way involve public health or safety. If the State wants to establish a uniform grade and require that those who wish to sell by this grade must comply with the standards set up, as the Federal Act does, well and good; Appellant would be free to derive the benefits of the standard grade if he so chose or rely on his own grading system to establish a reputation for qual-

ity with the buying public. But to compel the Appellant to grade and sell its eggs by the standards set by this Act and none other, or else sell his eggs as 'ungraded', is to subject Appellant to the harsh burden of choosing to attempt to comply with the Act's grading requirements, thereby subjecting itself to criminal liability for a misgrading without regard to the circumstances of the error or Appellant's good faith effort to comply, or on the other hand, choosing to sell his product under what is patently a disparaging label.

" * * * The Appellant respectfully submits that there is no danger to public health or safety involved in the question of whether the yolk of an egg is firm and the white adheres closely, nor any public need which is of sufficient importance to necessitate the regulations imposed by this Act.
" * * * Appellee contends that the Act might also be sustained as an Act to prevent fraud and misrepresentation in the sale of eggs. But is there fraud or misrepresentation involved if Appellant sells its eggs upon its own grading system and the public chooses to rely on Appellant's reputation and business experience to insure that it buys eggs worth what it pays for? This is nothing more than what happens everywhere, time after time, as to virtually every product in the marketplace. As long as Appellant sells chicken eggs and not duck or turkey eggs and so long as it does not represent that the eggs conform to an established grade, when in fact they do not, is the buying public in any way misled? Appellant has an established

(1) In lots of two or more cases, no individual case may fall below 70 percent of the specified quality and no individual case may contain more than double the tolerance specified for the respective grade (i. e., in lots of Grade A, not more than 10 percent of the qualities in individual cases within the sample may be C or

Check, provided the average is not over 5 percent).
(2) Within tolerance permitted, an allowance will be made at receiving points or shipping destination for ½ percent leakers in Grades AA, A, and B, and 1 percent in Grade C.
(3) Substitution of higher qualities for the lower qualities specified is permitted."

business reputation of which he is proud for selling eggs that give the consumer full value for his money; and the Appellant respectfully submits it is constitutionally entitled to continue that practice so long as there is no danger to the public health and so long as the public chooses to rely on his business reputation and buy his product."

■ We cannot agree with appellant that this Act is unconstitutional in its entirety. We believe it a valid exercise by the Legislature of the police power of the State. This power has been variously defined. As typical and authoritative we quote from 9 Tex.Jur., Constitutional Law, Sec. 74:

"The police power is a grant of authority from the people to their governmental agents for the protection of the health, safety, comfort and welfare of the public. It is a necessary and salutary power, since without it society would be at the mercy of individual interests and there would exist neither public order nor security.

"'Police power is the name given to that inherent sovereignty which it is the right and duty of the government or its agents to exercise whenever public policy in a broad sense demands, for the benefit of society at large, regulations to guard its morals, safety, health, order or to insure in any respect such economic conditions as an advancing civilization of a highly complex character requires.'"

■ To be justified under the police power the legislative act complained of must be reasonable in light of all the circumstances. 9 Tex.Jur. p. 508.

In determining whether or not this Act as a whole is reasonable it is not necessary that we discuss at length the qualities, good and bad, of a chicken egg. They are well and commonly known. Their economic importance is attested by the fact that about three billion eggs are annually consumed in Texas, about two billion of which are locally produced.

Appellant cites us to no case which holds that as a matter of law and in all cases aesthetic standards for handling or merchandizing foods are unreasonable and hence unconstitutional. We have found no case so holding.

The rule of reason, to be applied here, must be one which is founded on realism and on common experience. We know that food to be merchantable must be pleasing to the eye as well as to the palate. Any super market evidences the truth of this statement. A green orange cannot compete with a yellow orange, so it is colored. An egg, known to be runny, could not possibly compete with an egg which when broken will stand firm, its golden round yolk remaining intact and surrounded by the pearly white. Is it reasonable that a housewife should know when she buys an egg whether it will run or not? We submit that it is. Many people will not eat such an egg and economic loss results. Some people even suffer loss of appetite at the sight of a runny egg. Certainly eggs which are not firm when broken cannot be cooked or served in many of the ways in which firm eggs are cooked and served.

■ We believe a form of deceit is practiced upon the consuming public when it purchases eggs which run believing it has purchased firm eggs which do not run. It is within the power of the Legislature to protect the public against fraud or deceit. Nash Hardware Co. v. Morris, 105 Tex. 217, 146 S.W. 874.

■ Since the consumer cannot easily determine how an egg looks on the inside without breaking it we believe that it was entirely proper that the Legislature require that the inside of the egg be examined by persons in the egg business if this could be accomplished in a reasonable manner. The evidence discloses that this can be done

by "candling" the egg, a practical but not perfect way of inspecting and grading eggs.

Appellant uses this candling process in his business even when it was not required by law. It was that practical. It is accurate enough to be used throughout the United States of America under the United States Department of Agriculture regulations and standards. It is, according to the testimony of Frank J. Santo, United States Department of Agriculture Supervisor of Poultry Grading for ten states including Texas, used to determine grades with a fair degree of accuracy and that this may be done by "the individual making the grading by the method of candling if he does it conscientiously and is properly instructed." In any event the Texas Egg Law does not demand perfection in grading eggs. The tolerances allowed are shown in Footnote 3. Under our law the same tolerances for errors in grading are used in Texas that are used throughout the United States under the United States Department of Agriculture regulations. Further, these same candling and grading requirements with the same tolerances allowed are being voluntarily used by many Texas egg handlers under the Federal-State grading program. The contention of appellant that the candling and grading required by the statute imposes an impossible burden on him is not sustained by this record.

It is true that eggs commence deterioration when laid and that passage of time and other causes such as jolting in shipping may result in a Grade "A" when inspected by the dealer becoming an egg of lesser grade by the time it is inspected by an enforcement officer.

To our minds, these matters are normal risks of the egg business. They may be guarded against by the exercise of reasonable but diligent precautions, care and attention. This is the very purpose of the Act.

As to the requirement of the Act that eggs not graded shall be marked "ungraded" we are convinced of its reasonableness. All that this provision requires is that the truth be stated. As said by a New York Judge in Department of Farms & Markets of State of New York v. Swift & Co., 105 Misc. 225, 174 N.Y.S. 200, 201: "I do not see what hardship or injustice a merchant can experience in calling an article what it is."

The contention that this Act is discriminatory because it exempts producers of eggs except as provided in Sec. 11 when a grade of egg is claimed depends upon the reasonableness of the classification made by the Legislature.[4]

The evidence discloses, and we know as a matter of common knowledge, that the great bulk of eggs sold to the consumer are not bought from the producers. When the consumer does buy from the producer there is usually a personal relationship between the two that the Legislature apparently felt a sufficient guaranty against fraud and deception justifying the exemption of the producers in this comparatively isolated situation. It is to be remembered, of course, that producers are not exempt if an egg grade is claimed.

In classifying and exempting the producers the Legislature was entitled to consider the economic strain which the producers would have been subjected to if the Act applied to them when selling direct to the consumer. Ex parte Tigner, 139 Tex. Cr.R. 452, 132 S.W.2d 885. To some producers this burden may have been nigh prohibitive.

It is our opinion that there is nothing in the Act and nothing in this record

---

4. "While the constitutional guaranty does not forbid the classification of subjects and persons for the purpose of regulatory legislation, it does require that the classification be, not arbitrary, or unreasonable, but based upon a real and substantial difference, having relation to the subject of the particular enactment. If there is a reasonable ground for the classification and the law operates equally on all within the same class, it will be held valid." 9 Tex.Jur. 558.

which would authorize or justify a decision by us that the exemptions of producers under the conditions stated is arbitrary, unreasonable or unlawfully discriminatory.

Appellant's second point is that portions of Section 5, 6 and 7 of the Act are so vague and ambiguous as to be unconstitutional.

■ To be valid a penal statute must be capable of being understood. Ex parte Leslie, 87 Tex.Cr.R. 476, 223 S.W. 227. Art. 6, Vernon's Ann.P.C.

We quote below appellant's specific complaint made regarding the validity of Sections 5, 6, and 7:

"Section 5, 'Going to a dealer for candling and grading'. Does this mean any time prior to actual candling and grading, or does it mean any time prior to the first sale to a dealer who could grade or candle if he wanted to?

"Section 5, 'Any eggs unfit for human consumption due to causes other than those listed in this section'. Does the word 'unfit' mean inedible or not desirable; for example, an egg which has been fertilized, but in which incubation has not actually started? What is included in the phrase, 'causes other than those listed in this section?'

"Section 6, 'Or other words of similar import'. Similar to what? The words listed previously to these words are certainly not similar to each other.

"Section 7, 'Properly handled to prevent undue deterioration' and 'handled under reasonably sanitary conditions'. Under the provisions of this section, at what temperature must Appellant's storeroom be kept and at what per cent humidity? What temperature and humidity must the 'candling' rooms and packaging rooms be maintained? Must Appellant's trucks be refrigerated for local deliveries? How much deterioration is 'undue deterioration?' Is a

change in grade of the eggs 'undue deterioration?'"

■ The first complaint as to Section 5 is untenable. The language of this section is clear in stating that a tolerance of 5% of inedible eggs is permitted when eggs are sold to a dealer who is required by Sec. 3 of the Act to candle and grade eggs. This section does not mention first sale and it does not mention a time as appellant interpolates. Our construction of this section is based on what it provides and not by what it omits.

Appellant next asks regarding Section 5 about the meaning of the words "unfit for human consumption." Certainly "unfit" does not mean undesirable. The quoted phrase to us means, as applied to eggs, eggs which cannot or should not be eaten by human beings.

The phrase "due to causes other than those listed in this section" is clear. It is all inclusive. It means if the egg is inedible for *any reason* they come within the purview of the section.

Answering the objection to Section 6, "Similar to what?" we say that the meaning is that if any of the words used have a synonym or if there is another word of similar meaning then the use of such words in advertising or selling eggs is unlawful if they are below "Grade A."

As to the first sentence of Section 7 we doubt if the word "properly" adds to its meaning. Eggs handled so as to prevent undue deterioration would be properly handled. The words "undue deterioration" means excessive, improper or unwarranted deterioration. No particular method of handling is prescribed and the circumstances of each incident would of necessity control the application of this section. This statement is also applicable to the construction and meaning of the words "under reasonably sanitary conditions" in Section 7.

Sustaining the validity of these portions of Section 7 against the contention that they

are indefinite and vague is the case of State v. Texas & P. R. Co., 106 Tex. 18, 154 S.W. 1159, 1161, where the Court said:

"Neither do we regard the act inoperative or violative of either the federal or state Constitution because of any vagueness or uncertainty in its terms. A requirement that the water closets be kept in a reasonably clean and sanitary condition; that they be located within a reasonable and convenient distance from the passenger depots or be kept in connection therewith, and that they be kept well lighted, presents no difficulty to the understanding, and should present none in its observance. Its terms are suitable to the subject-matter of the act; and, having regard for the difference in conditions at the stations upon railway lines where it is made operative, the use of more specific language would very probably have provided only an arbitrary and impracticable rule."

Appellant's third and last point is that Sections 5, 6 and 17 of the Act are arbitrary and unreasonable and impose undue and unreasonable burdens upon it not demanded by public interest and are invalid under Art. 1, Sec. 19, of the Texas Constitution, Vernon's Ann.St., the due course of law provision.

■■■ The validity of Sec. 5 of the Act is challenged here on the ground that it is unreasonable because there is no public necessity for grading eggs and prohibiting the sale of inedibles as between wholesalers, appellant saying that as between wholesalers this is a matter of "private concern."

This question was considered in Ex parte Casperson, 1945, 69 Cal.App.2d 441, 159 P. 2d 88, 91 and we quote with approval the holding there made:

"Petitioners further contend that the sale or transfer of eggs between wholesalers, particularly where, as in the present case, the eggs were purchased 'as is', is not a public offense, even though the eggs may be inedible or mislabeled, in that the 'egg law is strictly a consumers' law', and that the argument of respondent which would have required the candling of the eggs in question by petitioners prior to the shipment to the wholesaler, Wilson would have accomplished nothing, as he in turn likewise would have had to candle the eggs before selling them to a retailer. Petitioners then conclude that to so argue is to assume that the legislature intended to place upon wholesalers frivolous and ridiculous burdens, and if this be true, the provision is thereby unreasonable and invalid. We find no merit in this contention.

"* * * It is * * * apparent that the legislature wisely anticipated that the best and most effective method to insure good eggs, properly labeled, was to prohibit all of the enumerated acts in relation to inedible or mislabeled eggs as set forth in said section at every stage from producer to consumer. People v. Wilson & Co., 138 Misc. 440, 246 N.Y.S. 111. The act, therefore, is no more a consumers law then it is a producers, a wholesalers, or a retailers law. In other words it is an act designed to keep every phase of the egg business free of inedible and mislabeled eggs."

The Legislature in enacting the Texas Egg Law undertook to protect the wholesaler as against another wholesaler in the purchase and sale of eggs as well as the consumer of eggs. We can think of no reason and none has been suggested to us for holding that this is an unconstitutional or unworthy purpose. On the contrary we deem it a laudable legislative objective and one in which a segment of the public (egg wholesalers) is vitally interested. It is true that eggs may require grading more than once but this is merely incidental to being in the egg business. Also the frequency of grading will diminish the number of inedible eggs ultimately reaching the consumer.

■■■ We have answered above the contention of appellant that the grading of

eggs through candling places an impossible burden on appellant and we will not repeat it here. In addition, however, appellant here contends that there is no rational basis for the provisions of Section 6 which prohibit the advertisement or sale of eggs below the Grade of "A" as "fresh" etc. eggs. We are not in accord with this contention.

Mr. F. Z. Beanblossom, a poultry marketing specialist for the Texas A & M College Extension Service with thirteen years experience working with the people of Texas in that capacity, testified to research experiments conducted at Bryan, Texas, under his supervision by the A & M College Extension Service showing that purchasers preferred eggs labelled "fresh infertile" to eggs labelled "Grade A Large." Sixty-seven and four-tenths per cent of the eggs sold in the research experiment were advertised as "fresh infertile" as compared with thirty-two and six-tenths per cent of the eggs sold being advertised as "Grade A Large," even though the eggs under the "fresh infertile" label were of varying sizes, some large, some small, some stained and dirty, and some of "B" Grade, while the eggs under the "Grade A Large" label were actually all large eggs of "Grade A" standard—clean, unbroken and free from defects or blemishes.

Mr. Beanblossom further testified:

"Q. Then, sir, does that indicate to you that those who sell or advertise shell eggs below the quality of Grade 'A' should not advertise those eggs as fresh or yard or selected or hennery or new-laid, infertile, cage, or with other words of similar import, because it confuses the consumers? A. Yes, sir, I actually believe it does. My experience would lead me to believe that it is only remote cases that the homemaker of Texas would not consider fresh and other words of such import as a means of identifying quality, high quality in the eggs.

\* \* \* \* \* \*

"Q. Well, is it your idea, then, that the people who have been used and

accustomed to buying an egg which is labelled 'J. W. Nichols A-plus' would have purchased the fresh and infertile egg in preference to the brand that I have just illustrated? A. Are you asking for a personal opinion?

"Q. No, I am asking you if you know. A. My experience would lead me to believe that it is only remote cases that the homemaker of Texas would not consider fresh and other words of such import as a means of identifying quality, high quality in the eggs."

This testimony as well as our own common knowledge make it evident that a reasonable basis exists for the restrictive advertising made compulsory by Sec. 6. The misleading effect of the banned advertisements has been demonstrated and the public needs and is entitled to protection against its continuance.

Sec. 17(a) is attacked as unreasonable. This section requires a record to be kept of all sales and purchases of eggs. In this regard Mr. J. W. Nichols, president of appellant, testified:

"Q. Have you made any survey of your operations to determine just exactly what you must do with your business to comply with that requirement of the law? A. I haven't made any survey. I have thought and tried to figure out how it would be possible to even comply with it, regardless of expense. The expense of it would be enormous, and it would take—it would take a crew, how many I don't know, but it would take a crew of secretaries and book keepers to keep track of those eggs as they go through our place.

\* \* \* \* \* \*

"Q. If you had to comply with that requirement, sir, would you tell us what it would entail in the operation of your business as opposed to the manner and method in which you operate now? A. Well, if I can make a little explanation of the nature of our business,

maybe you can understand this better, We buy eggs from anybody that wants to sell us eggs. These may come in in a truckload of 500 cases. They may come in in one case or two and a half cases. They may come in half-a-case, and they may come in three dozen at a time. These eggs are assembled in the cases. One case of eggs, it's—I can see where it would be possible to have the eggs from half-a-dozen producers —that would be unusual, but it would be possible, that one case of eggs would come from a half-a-dozen producers. Then, those eggs are candled, and we make about eight different grades of eggs. Some of these eggs are of the same grade, but, for instance, there will be 'A' grade white go into a carton. There will be 'A' grade of white go into a case, a 30-dozen case, which are not cartoned. There will be an 'A' grade mixed go into a carton, 'A' grade mixed go into a case. You have got the sizes to handle the same way. There is the large, the medium, the small, and the pee-wee. This case of eggs, there is no telling how many times it will be divided. It would just be, oh, every time you went to candle eggs, you would have to get a secretary to stand right there at the elbow of the candler to keep track of these different eggs to see where they come from and see where they went to."

■ We can readily understand the difficulties and expense which may attend compliance with this requirement of the law. Experience may prove that it is oppressive and casts an intolerable burden. We are unwilling, under this record, to hold this section unreasonable and invalid. The law does not plainly and on its face require the impossible or that which is unduly burdensome. The American business man is ingenious and until it is shown by experience under this section that compliance with it is unreasonable we refrain from making a final declaration of law in this respect. We consider this an appropriate disposition of this assignment under the principle of the rule that a declaratory judgment should not be based upon facts which are subject to mutation and change. Southern Traffic Bureau v. Thompson, Tex. Civ.App., 232 S.W.2d 742, San Antonio Civil Appeals, writ ref., N.R.E. Unknown and undeveloped facts cannot be made the basis of a declaratory judgment any more than facts subject to change may be the basis of such judgment.

■ Appellant's attack on the validity of 9(e) of the Act has been considered and our ruling prepared but before our opinion could be delivered we became aware of S.B. 438, 56th Leg., Reg.Sess.1959, c. 335, approved by Governor Price Daniel May 30, 1959, and immediately effective, Vernon's Ann.Civ.St. art. 165–8, § 9(e). This bill amends Sec. 9(e) so that it now reads:

"(e) not be labeled 'fresh' if the eggs offered for sale have been held under refrigeration for a period of sixty (60) days or more. These eggs which are held sixty (60) days or more shall not be labeled 'AA' or 'A'."

The original Sec. 9(e) is no longer a legislative enactment and a declaration as to its validity is now moot.

The new Sec. 9(e) is not before us and we make no decision or declaration as to its construction or validity.

It follows from our legal pronouncements that appellant is not authorized to continue to use its brand "J. W. Nichols—A-plus Eggs" irrespective of the provisions of the Texas Egg Law. If the eggs are not graded they should be marked "Ungraded," as required by Sec. 4. Furthermore "A-plus" implies a grade and if the eggs are not graded this violates Sec. 9(b) prohibiting deceptive labelling.

We render declaratory judgment in accordance with the legal rulings herein made and the judgment of the Trial Court is reformed to conform therewith and as reformed its judgment is affirmed.

Reformed and affirmed.